DAVID B. BARLOW, United States Attorney (# 13117)
CARLOS A. ESQUEDA, Assistant United States Attorney (#5386)
185 South State Street, Suite 300
Salt Lake City, Utah 84111-1506
Telephone: (801) 524-5682; Facsimile: (801) 524-6924

JACK SMITH, Chief, Public Integrity Section, Department of Justice
MARIA N. LERNER, *Trial Attorney*, Public Integrity Section
KEVIN O. DRISCOLL, *Trial Attorney*, Public Integrity Section

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture and Money Laundering Section
PAMELA J. HICKS, *Trial Attorney,* Asset Forfeiture and Money Laundering Section

*Attorneys for the United States*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | I N D I C T M E N T |
| Plaintiff, | 18 U.S.C. § 371<br>(Conspiracy)(Count 1) |
| vs. | 18 U.S.C. §§ 1343, 1346<br>(Honest Services Wire Fraud)<br>(Counts 2 through 9) |
| ROBERT G. LUSTYIK, JR.,<br>MICHAEL L. TAYLOR, and<br>JOHANNES W. THALER, | |
| Defendants. | 18 U.S.C. § 1503(a)<br>(Obstruction of the Due<br>Administration of Justice)<br>(Count 10) |
| | 18 U.S.C. § 1505<br>(Obstruction of Proceeding Before<br>Department or Agency)(Count 11) |

Case: 2:12-cr-00645
Assigned To : Stewart, Ted
Assign. Date : 10/18/2012
Description: USA v.

1

The Grand Jury charges:

## BACKGROUND

Unless otherwise specified, all dates in this Indictment are "on or about" the specific date stated. Unless otherwise specified, at all times relevant to this Indictment:

1.      From May 1988 to September 2012, ROBERT G. LUSTYIK, JR., was a Special Agent with the Federal Bureau of Investigation ("FBI"). Before his retirement, LUSTYIK was assigned to counterintelligence work in the New York Division, White Plains Resident Agency. LUSTYIK was eligible to retire in June 2012.

2.      MICHAEL L. TAYLOR was the principal of American International Security Corporation ("AISC"), a company located in Boston, Massachusetts, that offered a range of security-related and other services to private and public clients both domestically and internationally. In 2007, AISC was awarded a contract by the United States Department of Defense ("DoD") to provide training and related services to Afghan Special Forces in Afghanistan ("the DoD Contract"). AISC eventually received over $54 million in payments on this contract.

3.      JOHANNES W. THALER, sometimes referred to as "Hannes," was a childhood friend of LUSTYIK.

4.      From at least June 2011, until approximately September 2012, LUSTYIK, TAYLOR, and THALER had a business relationship involving the pursuit of contracts for (among other things) security services, electric power, and energy development in South Sudan, Lebanon, Iraq, and the United Arab Emirates ("UAE"), among other locations in the Middle East, Africa, and elsewhere.

2

5.     Beginning in or about mid-2010, the DoD's Defense Criminal Investigative Service ("DCIS"), the Internal Revenue Service ("IRS"), and the United States Department of Homeland Security ("DHS") were conducting an investigation into TAYLOR, AISC, and others regarding allegations of fraud in the award and performance of the DoD Contract, and of money laundering to conceal the source and ownership of the proceeds derived from the fraud. From in or about October 2010 until August 22, 2012, a Federal Grand Jury in the District of Utah was also investigating the same allegations. (Hereinafter these investigations will collectively be referred to as "the Utah investigation.")

6.     On September 2, 2011, the United States initiated a civil action seeking to forfeit certain assets and real property of TAYLOR, AISC, and others that were derived from or otherwise traceable to the DoD Contract fraud scheme. Related to the filing of the civil forfeiture case, more than five million dollars ($5,000,000) in AISC's bank account was seized by the United States on September 7, 2011, alerting TAYLOR to the Utah investigation.

7.     On August 22, 2012, a Federal Grand Jury in the District of Utah indicted TAYLOR, AISC, and others on multiple counts of conspiracy, procurement fraud, bribery, wire fraud, and money laundering in connection with the DoD Contract. TAYLOR's co-defendants in that case are Christopher Harris and David Young.

8.     A "dead drop" is a password-protected email account where the participants (who are all informed of the username and password) sign in to post – as draft emails – messages or information that they wish to share with the others, without having to send those emails through their individual email accounts. When one participant leaves a draft message in the dead drop, he then notifies the other individuals that there is a message in the dead drop and they, in turn, log in, read the message, and delete it, thereby avoiding leaving a record of their communication.

3

## COUNT ONE

### 18 U.S.C. § 371
### (Conspiracy)

9.      The allegations contained in paragraphs 1 through 8 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

10.      From at least October 2011, through in or about September 2012, in the District of Utah and elsewhere, the defendants,

### ROBERT G. LUSTYIK, JR.,
### MICHAEL L. TAYLOR, and
### JOHANNES W. THALER,

knowingly and willfully conspired and agreed together and with others known and unknown to the grand jury to commit an offense against the United States, that is:

(a) To, directly and indirectly, corruptly give, offer, and promise a thing of value to LUSTYIK, a public official, with intent to influence an official act, that is, offering to pay LUSTYIK money in exchange for official actions taken by LUSTYIK to impede and otherwise obstruct the Utah criminal investigation into TAYLOR, in violation of 18 U.S.C. §§ 201(b)(1) and 2;

(b) To corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due administration of justice in a Federal Grand Jury in the District of Utah, by using, and aiding and abetting the use of, LUSTYIK's official position as an FBI agent to undertake a series of official actions intended to frustrate, delay, and influence the Utah grand jury investigation of TAYLOR, in violation of 18 U.S.C. §§ 1503(a) and 2; and

4

(c) To corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had, namely a federal criminal investigation being jointly conducted by the United States Department of Defense, the United States Department of Homeland Security, and the Internal Revenue Service, by using, and aiding and abetting the use of, LUSTYIK's official position as an FBI agent to undertake a series of official actions intended to frustrate, delay, and influence the Utah investigation of TAYLOR, in violation of 18 U.S.C. §§ 1505 and 2;

and in furtherance of the conspiracy and to effect the objects of the conspiracy LUSTYIK, TAYLOR, THALER, and others committed and caused others to commit overt acts in the District of Utah and elsewhere.

## PURPOSE OF THE CONSPIRACY

11.     The purpose of the conspiracy was for LUSTYIK, aided and abetted by THALER and TAYLOR, to take official actions to obstruct the Utah investigation into TAYLOR, in exchange for which TAYLOR offered LUSTYIK and THALER a stream of things of value, including but not limited to a share in profits on anticipated contracts worth millions of dollars.

## MANNER AND MEANS

The conspiracy was carried out in the following ways, among others:

12.     TAYLOR corruptly offered and provided a stream of things of value to LUSTYIK and THALER, including but not limited to a $200,000 cash payment; money purportedly for the medical expenses of LUSTYIK's minor child; and a share in the proceeds of:

(a) an anticipated contract to provide security for a multi-million barrel oilfield in South Sudan;

(b) an anticipated power-generation contract in Iraq worth more than $50 million;

(c) an anticipated contract for security and surveillance equipment and services in the UAE worth more than $100 million; and

(d) an anticipated contract to broker the sale of 4 million barrels of oil per month from Iraq to a Chinese refinery.

13.     In exchange, LUSTYIK, while serving as an FBI agent, corruptly took, purported to take, and agreed to take a series of official actions intended to influence, impair, and impede the Utah investigation of TAYLOR, including but not limited to opening TAYLOR as an FBI confidential human source; seeking to interview potential witnesses and targets in the Utah investigation; and using his official authority and position to contact the federal law enforcement agents and federal prosecutors in Utah to dissuade them from charging TAYLOR.

14.     THALER served as a conduit between TAYLOR and LUSTYIK for both information and things of value.

15.     LUSTYIK, with assistance from TAYLOR and THALER, took steps to conceal the full extent of his business relationship with TAYLOR from LUSTYIK's employer, the FBI, as well as the federal law enforcement agents and federal prosecutors conducting the Utah investigation into the DoD Contract, including by:

(a) making material misrepresentations and omissions to the Utah federal law enforcement agents and federal prosecutors regarding the length and nature of LUSTYIK's relationship with TAYLOR and the existence of a business relationship between them;

6

(b) using a dead drop email account to communicate about the bribery and obstruction scheme. LUSTYIK, TAYLOR, and THALER used the names of two football teams -- the Giants and the Patriots (or Pats) -- as the password for the dead drop, in addition to using the names of those teams as shorthand to inform each other that the dead drop contained new information;

(c) using LUSTYIK's personal email account to communicate about their schemes, and using LUSTYIK's official FBI email account to communicate with the federal law enforcement agents and federal prosecutors working on the Utah investigation; and

(d) using coded language to refer to each other and their activities, including referring to TAYLOR as "Captain America" or "Capt.", and referring to LUSTYIK as "the big guy."

## OVERT ACTS

16.    In furtherance of the conspiracy, and in order to accomplish its objects, defendants LUSTYIK, TAYLOR, THALER, and others committed overt acts in the District of Utah and elsewhere.

### OVERT ACTS TO CORRUPTLY OFFER AND SOLICIT THINGS OF VALUE

17.    On November 24, 2011, LUSTYIK and THALER exchanged a series of text messages regarding the Utah investigation into TAYLOR and their mutual business pursuits. LUSTYIK opened the exchange by telling THALER, "I think we r rich by christmas !!", and when THALER asked why, LUSTYIK responded, "[h]e is gonna be free!!!!!!!!"  LUSTYIK went on to tell THALER that TAYLOR's money was soon going to be released, to which THALER responded, "[n]ice!", and suggested that LUSTYIK inform TAYLOR of the news.

18.     On November 27, 2011, TAYLOR emailed THALER to tell him that "[LUSTYIK] called me earlier this evening. He say [sic] this thing I'm dealing with is over and I should have my funds returned before X-Mas."

19.     On December 20, 2011, in the midst of a series of emails between TAYLOR and THALER about brokering the sale of oil from Iraq to a Chinese refinery, TAYLOR instructed THALER to "[m]ake sure you let the big guy know about this. We want him retired in 6 months to work with us. I'll make you guys more money than you can believe. provided they don't think I'm a bad guy and put me in jail," to which THALER responded, "[t]he big guy knows."

20.     The next day, December 21, 2011, THALER forwarded TAYLOR's email to LUSTYIK, telling him "[c]heck this out."

21.     On February 9, 2012, THALER sent LUSTYIK a text message to inform him that he had "[j]ust talked to [TAYLOR]. He told me to bring my bank wire transfer numbers to Lebanon," LUSTYIK responded: "YES. He is giving me money 'for [LUSTYIK's minor child] surgery' [sic]." LUSTYIK then continued: "Hopefully 100gs."

22.     On February 15, 2012, THALER emailed TAYLOR his bank wire transfer information.

23.     On February 25, 2012, LUSTYIK and THALER exchanged a series of text messages regarding LUSTYIK's belief that TAYLOR would give THALER money. LUSTYIK stated, "Taylor is gonna hand u cash in Lebanon," and a few minutes later added, "[l]ike 150 gs." When THALER asked LUSTYIK how to bring back the cash from Lebanon, LUSTYIK responded, "[i]n ur pants. Or wire it ? They won't stop 2 white guys at customs wo a reason," and then added, "[o]r I meet u at customs at jfk n cred u in."

8

24.     On March 5, 2012, during an email exchange between TAYLOR and THALER discussing THALER's upcoming business trip to Lebanon, THALER wrote to TAYLOR: "A while back, you mentioned something about helping out the big guy with his [minor child's] doctor bills. I would love to surprise him with a little something upon my return. He's been busting his ass trying to clear up your predicament and I think it's just a matter of time because they really have no case from what he's been telling me."

25.     On March 6, LUSTYIK sent a text message to THALER, stating, "[d]on't forget to mention to MT [TAYLOR] how hard I'm working on getting his shit pushed aside and how tough I'm having it with [LUSTYIK's minor child's] recent surgeries," and later that day, LUSTYIK again asked THALER, "[l]et me know if MT [TAYLOR] has anything for [LUSTYIK's minor child]?"

26.     On March 7, 2012, LUSTYIK and THALER exchanged text messages regarding getting money from TAYLOR, with LUSTYIK opening the exchange by asking, "[s]till no talk of [LUSTYIK's minor child]?" and THALER replying, "[j]ust did. 10 tomorrow 200 later."

27.     On March 8, 2012, LUSTYIK sent a text message to THALER asking him, "[a]ny word on that 200 for [LUSTYIK's minor child] cause half is to Uncle Hannes."

28.     On March 9, 2012, LUSTYIK and THALER again exchanged text messages regarding getting money from TAYLOR, with LUSTYIK asking THALER, "[h]ey what's my salary?" and immediately followed that text with another, "[a]ny [LUSTYIK's minor child] stuff frm MT [TAYLOR] ?" THALER responded, "$300g for u. . . . Haven't gotten anything for [LUSTYIK's minor child] yet. I think he's waiting to see if anything happens this week."

29.     On March 15, 2012, THALER sent a text message to LUSTYIK, "Capt put 10 in the account today. Won't be able to access it until Monday."

30.     On March 19, 2012, TAYLOR caused a $10,000 transfer to be made into a bank account owned and controlled by THALER.

31.     On March 21, 2012, in responding to an email from TAYLOR regarding a power-generation contract TAYLOR was pursuing on their behalf in Iraq, THALER emailed TAYLOR and noted that he had calculated their expected profits based on the numbers TAYLOR had provided him: "If our cost is $64mil, our net will be $58 mil per year."

32.     On March 21, 2012, after receiving THALER's calculation of expected profits, TAYLOR copied LUSTYIK on the email string, and wrote "Not bad for a start up company."

33.     On March 24, 2012, when LUSTYIK sent a text message to THALER stating, "[b]est news I've got is the ausa called again n basically said that mike is gonna be left alone. He will speak to mike's lawyer this week," THALER responded, "[t]hat would be great.  As soon as that happens we get some $.  Capt will be very grateful."

34.     Later that day, March 24, 2012, LUSTYIK continued that text thread with THALER by suggesting that THALER ask TAYLOR to give both of them a loan, stating, "[h]e knows we r keeping him outta jail."

35.     On April 4, 2012, TAYLOR wrote to LUSTYIK that the Utah prosecutor "needs to hear it from your USA [United States Attorney] or someone up high," and finished by advising LUSTYIK that TAYLOR was "writing a proposal for the 150 MW [megawatt] deal that we are going to sign in the next 3 to 4 days."

36.     On April 12, 2012, after THALER wrote to TAYLOR that LUSTYIK was "worried about the debt that he's carrying for all the surgeries [on his child]," TAYLOR assured THALER that "[w]e will get those bills squared away."

10

37.     On April 21, 2012, in an email thread discussing LUSTYIK's efforts on TAYLOR's behalf, TAYLOR told LUSTYIK: "I can't begin to tell you how much I appreciate you! But I sure can show you when it's done and over with. Thank you!"

38.     On May 24, 2012, after LUSTYIK provided TAYLOR with additional updates on his efforts on TAYLOR's behalf, TAYLOR informed LUSTYIK that the UAE was prepared to enter into contracts for security-related products and services that would yield "a total of $90 million per year."

39.     On June 3, 2012, LUSTYIK and TAYLOR exchanged emails regarding the effect of LUSTYIK's efforts on the Utah investigation. LUSTYIK first told TAYLOR: "So we have got them running scared now. Their investigators are panicked about our calls n meeting w [an FBI section] and main Justice." Further on in the discussion, LUSTYIK wrote, "[t]his will come down to the egos of the ausas. They won't want to lose. So since they will have 15 special agents against them as witnesses they will fold." TAYLOR responded that he'd "really like to end this and rake in some serious doe [sic] on these projects here which is starting to happen."

40.     Later in the same email exchange, on June 3, 2012, TAYLOR also informed LUSTYIK that he had a meeting in the UAE with the "Min of Defense . . . They say they are interested in contracting with us for the Buckeye and perhaps wanting 3 systems. That is 90 million a year and about 35 million for us."

41.     On June 11, 2012, TAYLOR sent an email to LUSTYIK and THALER in which he described the success of his trip to Abu Dhabi: "their Minister of Defense wants 6 systems. Each system sells for $30 million, each system give [sic] us $20 million profit. If I sold if [sic] for less they would not be excited about it."

11

42.     On July 25, 2012, THALER forwarded to LUSTYIK an email exchange he had had with TAYLOR regarding various business opportunities TAYLOR was pursuing for the three of them, with this comment: "This is what he sent me today. I don't think he knows for sure when we'll start getting paid. My best guess would be 2-3 weeks."

43.     On July 31, 2012, TAYLOR emailed LUSTYIK to tell him that "[w]e are about a week or so away from signing 3 large projects worth more than $80 million."

44.     That same day, July 31, 2012, LUSTYIK forwarded TAYLOR's email to THALER with a "?" appended to the top of the email, to which THALER responded that TAYLOR was "about to sign the Buckeye deal and the oil drilling deal," and LUSTYIK responded, "[w]ill we get any money from it ? And when?" After THALER responded "[h]ope so," LUSTYIK concluded the exchange by urging THALER to "ask him" for money: "Call him. He will tell you. He knows we need money. I said it in an email."

45.     On August 5, 2012, LUSTYIK emailed TAYLOR to tell him that he, LUSTYIK, had heard from one of the federal law enforcement agents on the Utah investigation, who was "panicked" about the contents of TAYLOR's FBI file and the effect it could have on the Utah case, and informed TAYLOR that LUSTYIK was turning down a job in the private sector because taking the job would leave him "out of the loop so....lets hope you are released of this ridiculous burden soon."

46.     On August 5, 2012, in that same email discussion, LUSTYIK switched topics to a discussion of a way that he and TAYLOR could "make some quick coin" by brokering gold sales to a friend of LUSTYIK's, and TAYLOR responded by telling LUSTYIK that "[q]uick coin is the easy part of this. Right after Ramadan it all starts rolling for us. 40 drill sites, Oil well

service which is starting now and the Buckeye. You will have more coin than you know what to do with. You were wise to turn down [the private sector job]."

47.    The next day, on August 6, 2012, after LUSTYIK wrote to TAYLOR, "[l]et's just get Utah over with and get stinking rich," TAYLOR replied: "Getting stinking rick [sic], we are well on the way with that so I have the ball."

48.    Two days later, on August 8, 2012, LUSTYIK sent text messages to THALER regarding their expected profits, writing "We will be rich by halloween," and "I mean like RICH."

49.    On September 12, 2012, LUSTYIK and THALER exchanged text messages regarding asking TAYLOR for money. LUSTYIK first wrote to THALER, ". . . did u ask MT [TAYLOR] about any money coming in?" and later, "[b]ut did u blatantly ask for money? He wants to give us (me) money for [LUSTYIK's minor child]." THALER replied, "I didn't ask for money directly. I only asked about the deals. I didn't know he was giving money for [LUSTYIK's minor child]." LUSTYIK then informed THALER, "[a]ll coded. I'm trying to get u some breathing room. [LUSTYIK's minor child] has surgery [date omitted]."

## OVERT ACTS TO ENDEAVOR TO OBSTRUCT THE UTAH INVESTIGATION AND CORRUPTLY AGREE TO TAKE OFFICIAL ACTION

50.    On October 15, 2011, two days after the District Court in Utah denied AISC's hardship petition seeking the return of the monies that had been seized on September 7, 2011, from its bank account, TAYLOR provided LUSTYIK the names and agency affiliations of two of the Utah-based federal law enforcement agents conducting the Utah investigation into the DoD Contract, along with the contact information for one of the two agents.

13

51.    On October 28, 2011, LUSTYIK instructed a fellow FBI agent in San Diego to "forward everything u got [on TAYLOR] to me" in order to permit LUSTYIK to "get Taylor open" as an FBI confidential human source.

52.    On January 10, 2012, after TAYLOR had emailed LUSTYIK regarding apparent efforts by TAYLOR's counsel to settle the civil forfeiture case in Utah, LUSTYIK assured TAYLOR that "I cannot believe you are even forced to ask me my opinion on this. All I can do is pledge my promise that I will bust my ass to make sure any future business endeavor erases this from your memory . . . I will not stop in my attempt to sway this your way."

53.    In or about January 2012, LUSTYIK opened TAYLOR as an FBI confidential human source.

54.    In or about February 2012, during a telephone conversation between LUSTYIK and one of the Utah federal law enforcement agents investigating the alleged DoD Contract fraud involving TAYLOR, LUSTYIK expressed disbelief that the agents would consider seeking to indict TAYLOR, and said that he, LUSTYIK, was trying to work TAYLOR as a confidential human source.

55.    In subsequent conversations with the same Utah federal law enforcement agent regarding TAYLOR's culpability, also in or about February 2012, when the Utah agent asked whether LUSTYIK was trying to shut down the Utah investigation, LUSTYIK replied negatively, but then suggested that it might come to that.

56.    On February 15, 2012, LUSTYIK and TAYLOR emailed each other about the Utah investigation, with LUSTYIK providing TAYLOR an update on the steps he was taking, including that: "Our ausa tells their ausa it has to go away now."

57.     On March 1, 2012, LUSTYIK and another FBI agent participated in a video teleconference with two of the prosecutors in Utah overseeing the Utah investigation to discuss the FBI's use of TAYLOR as a confidential human source.

58.     Later that same day, on March 1, 2012, LUSTYIK sent a text message to THALER, "I really sent a scare into those ausas today."

59.     On March 7, 2012, LUSTYIK wrote to TAYLOR to inform him that he, LUSTYIK, had heard from one of the case agents on the Utah investigation earlier that day, explaining: "Seems we sent them into a reevaluation of MT [TAYLOR] and his potential knowledge of incident based on our SVTCC [secure video telephone conference call]. We have now developed enough to get our HQ [headquarters] to intervene and that's what I will be selling Monday."

60.     On March 9, 2012, LUSTYIK emailed TAYLOR that "[w]e got some huge info that wil [sic] make it impossible for utah [sic] to indict u now. We will have it over next week I believe."

61.     That same day, on March 9, 2012, LUSTYIK texted THALER, "[j]ust did another interview. MT [TAYLOR] has no chance of indictment now. I own Utah."

62.     On March 15, 2012, LUSTYIK sent a text message to THALER, stating, "[a]t this point IF he is indicted there is NO WAY he gets convicted even though he Prob did it. Too many former people like me testifying on his behalf."

63.     On March 18, 2012, LUSTYIK and THALER exchanged text messages regarding whether LUSTYIK could hope to soon retire from his job as an FBI agent, whereupon LUSTYIK noted, "Keeping in mind that if I do then we might lose valuable contacts?" A few

15

minutes later, LUSTYIK added, "I can leave in June. But I'm afraid to if capt gets indicted n I'm not an agent I'm no help. Has he mentioned giving me-u a salary?"

64.     On March 19, 2012, when TAYLOR emailed LUSTYIK about a positive development in the Utah investigation, LUSTYIK responded, "See Buddy. I'm not BSing you. When our ausa spoke w/[the Utah AUSA] he began to panic because the woman at main Justice [sic] read my interviews . . . EVEN if they did indict….they lose huge now."

65.     On March 20, 2012, LUSTYIK wrote to TAYLOR, "[a]lthough I can retire in 2 months I believe it is in our best interests if I hang on until we have the Utah situation handled and the Network flowing correctly. It is the right thing to do."

66.     On March 25, 2012, amidst emails regarding a potential power-generation contract in Iraq, LUSTYIK wrote to TAYLOR, "[w]e r all set to blast Utah on 2 sides. I am committed."

67.     On March 28, 2012, LUSTYIK wrote to TAYLOR to inform him about an email he received from one of the Utah investigators, and about LUSTYIK's further efforts to end the Utah investigation: "As an investigator, this [the Utah law enforcement agent's email] shows me that he is in panic mode. He can't re-interview the people we have spoken with, and there really isn't anyone left for him to speak with. . . . What he is telling me is that he must have been chastised by [the Utah prosecutor] because now they have NO witness list. . . . Your lawyer should press the issue and ask them to 'reconsider' [sic] your offer to cooperate. . . . [Another FBI agent] and I are meeting w [a retired FBI agent] next week. He is your only 'critic' but I've led him to where we need him to be. . . . Now he is on the 'nice list.' [sic]"

68.     On April 3, 2012, LUSTYIK wrote an email to one of the agents handling the Utah investigation, asking the agent "Can't we just get [TAYLOR] to be a CW [cooperating witness] for you guys ??"

69.     On April 7, 2012, LUSTYIK emailed TAYLOR and told him: "[a]s far as Utah goes ... I will not stop clearing you until I hear from [the prosecutor] myself that its done. I am committed to bringing my organization back to a place where the Truth mattered and we had Balls. I present this to management as either u help or u r gutless. No quit in me and I continue to fight for you."

70.     On April 7, 2012, after TAYLOR expressed his gratitude to LUSTYIK for LUSTYIK'S efforts on the Utah investigation, LUSTYIK wrote, "We are at the higher HQ level now w an Assistant to the Director going to be briefed this coming week. Can only go one step higher..."

71.     On April 17, 2012, LUSTYIK opined to TAYLOR about the progress of the Utah investigation: "The rate this is going. I will be indicted way before u ever are !!"

72.     On April 20, 2012, LUSTYIK emailed TAYLOR and, after telling him about several calls that were purportedly being made on TAYLOR's behalf (presumably to the Utah federal prosecutors and agents), asked: "Can you think of anyone else that we can neutralize with an interview ? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive ? Where are Harris n Young ?"

73.     On April 20, 2012, TAYLOR replied to LUSTYIK's question: "Young is in Tampa, Florida and you can get to him," and provided LUSTYIK with Young's contact information, but that "Harris I heard is in Vietnam." TAYLOR further provided LUSTYIK with information on four additional witnesses in the Utah investigation.

74.     LUSTYIK concluded the April 20, 2012, email exchange with TAYLOR by pledging his commitment to derail the Utah investigation: "I am going to interview Young and just blow the doors off this thing."

75.     On May 15, 2012, LUSTYIK and TAYLOR discussed in an email the grand jury subpoena that had been served on Witness One, and LUSTYIK advised TAYLOR: "A lot of fight left either way Mike. [Witness One] is allowed to say whatever [Witness One] wants. They ask a question…[Witness One] starts every answer w. 'No way he did this.'"

76.     On May 16, 2012, LUSTYIK received an email on his official FBI email account from his supervisor, informing him that "we cannot have any unauthorized communications [with TAYLOR], period."

77.     Five days after the admonition from his supervisor, LUSTYIK and TAYLOR engaged in an email discussion about the Utah investigation.    After TAYLOR emailed LUSTYIK to inquire about whether there had been "[a]ny word from main justice," LUSTYIK responded to TAYLOR on May 21, 2012, and stated, "[h]opefully today."  LUSTYIK later stated in the same email exchange, "[w]ill call u tomorrow. [Attorney for Witness One] owes me a call back. Remind him please."

78.     On June 4, 2012, LUSTYIK described to THALER in a text message the efforts he was making on TAYLOR's behalf, telling THALER, "I'm on a freedom tour," and agreeing with THALER's assessment that he was "the new Harriet Tubman!"

79.     On June 7 and 8, 2012, LUSTYIK and another FBI agent traveled to FBI headquarters in Washington, D.C., to participate in meetings at which TAYLOR's suitability as a confidential human source was assessed.

18

80. On June 11, 2012, the same day that TAYLOR sent separate emails to LUSTYIK and THALER telling them that TAYLOR's lawyer had informed him he would be indicted, LUSTYIK had a telephone call with one of the Utah federal law enforcement agents, advising the agent that although the FBI would likely not stand in the way of an indictment of TAYLOR because "that Bureau is long gone," TAYLOR would nonetheless call current and former FBI agents, including LUSTYIK himself, as character witnesses.

81. On June 21 and 22, 2012, LUSTYIK sent a series of text messages to one of the federal law enforcement agents handling the Utah investigation, informing the agent that LUSTYIK was going to be "meeting w DOD next wed" about TAYLOR, and "[p]lease let [the DoD case agent] know" about the meeting, and that "[t]hey will be debriefing MT [TAYLOR]. Re our mutual joint op."

82. On June 22, 2012, LUSTYIK sent a text message to THALER, stating, "[w]anna fill u in on MT [TAYLOR]. I got it fixed. I'm so sneaky."

83. On June 26, 2012, LUSTYIK emailed TAYLOR that he, LUSTYIK, was "out schmoozing the DOD guys. They r gonna crush [the DoD case agent on the Utah investigation]. They r going to convince their boss to call [one of the AUSAs handling the Utah investigation]. I will call u right before lunch tomorrow. I'm gonna keep these guys out all night if I have to."

84. On July 2, 2012, using his official FBI-issued blackberry device, LUSTYIK sent yet another text to one of the federal law enforcement agents handling the Utah investigation, stating: "Looks like we r going to be doing another set of interviews. Did u guys interview [Witness Two]?"

85. On July 12, 2012, when LUSTYIK texted THALER regarding his efforts on TAYLOR's behalf in the Utah investigation, THALER told LUSTYIK that "if [TAYLOR's]

19

free. I'm sure you'll have a new occupation that pays better than your current position," to which

LUSTYIK responded, "I hope so cause I'm so fcuked [sic] at work now its crazy."

86.    On August 15, 2012, after TAYLOR learned that he would be indicted on August

22, 2012, he emailed LUSTYIK to alert him that it was going to happen "[u]nless someone tells

[a supervisory AUSA in Utah] to stop," to which LUSTYIK responded, "I'm on it."

87.    The next day, on August 16, 2012, LUSTYIK emailed TAYLOR to update him

on his efforts to stop the indictment, telling TAYLOR that "[t]here is a serious disconnect

somewhere . . . I've got to call [a supervisory AUSA in Utah] myself tomorrow."

### ACTS OF CONCEALMENT

88.    On October 25, 2011, in the midst of a discussion between LUSTYIK and

THALER regarding a deal to provide security to an oil field they were pursuing with TAYLOR,

LUSTYIK sent THALER an email in which he informed THALER that "taylor is looking for a

way to take care of me so I said u n I r working together on these and he said he will be sending

money ur way," later explaining that TAYLOR "has 2 contracts they r about to sign.  I think he

might want to give us 200 gs."

89.    On February 9, 2012, TAYLOR sent LUSTYIK an email with the subject heading

"Dead Drop," in which he wrote, "[o]ur site is AISC04@aol.com and the password is

Giants2012."

90.    On March 9, 2012, when TAYLOR asked LUSTYIK what the "huge"

information was that LUSTYIK said would make it impossible for the Utah prosecutors to indict

him, LUSTYIK responded the next day, "Go Giants !!!!"

91.    On March 19, 2012, LUSTYIK sent text messages to THALER regarding

interview reports he had done regarding TAYLOR, stating "[t]ell [TAYLOR] I want to show his

lawyer my 302s," and a few minutes later, "I've got to send them to u somehow. N his lawyer has to be shhhhhhhh."

92.     On May 7, 2012, LUSTYIK exchanged emails with THALER regarding concerns that their dead drop email account had been compromised, telling THALER, "I don't want it to be Utah or someone affiliated w them" accessing the dead drop, and expressing relief that, since it appeared that whoever was accessing the account was doing so using an iPhone, the source of the suspicious logins "[c]an't be the Bureau then."

93.     Five days later, on May 12, 2012, THALER emailed TAYLOR to tell him that the "big guy says we have to change boxes. I will print out what's in the current one and get it to him. I will call you with new box tomorrow."

94.     On May 14, 2012, THALER sent LUSTYIK a five-word email regarding the new drop box: "BME2012. Same mail service. Horsemen80."

95.     On June 11, 2012, LUSTYIK sent a text message to THALER, "[a federal agency] just denied me authority to speak w the Capt till he returns to US. I won't follow it, but I've gotta be crafty."

96.     On September 8, 2012, after TAYLOR returned to the United States from Lebanon, was stopped at the border, and certain of his electronic devices were seized pursuant to a border search, THALER sent a text message to LUSTYIK: "[TAYLOR] just called. He's back home. Customs grabbed his phone and laptop. He wants you to call him on his sons number [number omitted]."

97.     On September 8, 2012, LUSTYIK sent a series of text messages to THALER regarding the seizure of TAYLOR's electronics at the border, telling THALER: "Great. Now I

go to jail too," and further explaining, "I'm so fcuked [sic].  I told him not to travel w electronics."

98.    The next day, September 9, 2012, LUSTYIK texted THALER, ". . . MT [TAYLOR] mightve gotten me jammed up n sent to jail so he better come thru."

99.    A few minutes later, on September 9, 2012, LUSTYIK instructed THALER, "[y]ou might have to save me and testify that only you r doing business w him."

100.    On September 18, 2012, just nine days after LUSTYIK sent THALER that instruction, THALER told federal law enforcement agents, in a voluntary, recorded interview, that LUSTYIK was not involved in TAYLOR's and THALER's business.

101.    On September 18, 2012, the day TAYLOR made his initial appearance in this case, LUSTYIK instructed THALER that, "I just got suspended and may be arrested today based on helping capt.  Let him know asap !!!"

All in violation of Title 18, United States Code, Section 371.


## COUNTS 2 – 9

### 18 U.S.C. §§ 1343, 1346, and 2
### (Honest Services Wire Fraud)

102.    The allegations contained in paragraphs 1 through 8 and paragraphs 11 through 101 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

103.    From in or about October 2011, through on or about September 2012, in the District of Utah and elsewhere, the defendants,

22

**ROBERT G. LUSTYIK, JR.,**
**MICHAEL L. TAYLOR, and**
**JOHANNES W. THALER,**

and others known and unknown to the grand jury, devised and intended to devise a scheme and

artifice involving the concealment of material information to defraud and to deprive the Federal

Bureau of Investigation and the citizens of the United States of their right to the honest and

faithful services of LUSTYIK as a Special Agent of the FBI, through bribery.

Execution of the Scheme

104.    On the dates listed below, in the District of Utah and elsewhere, LUSTYIK, for

the purpose of executing the above-described scheme and artifice to defraud and deprive,

transmitted and caused to be transmitted by means of wire communication in interstate

commerce, the following writings, signals, and sounds:

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| 2 | 3/1/2012 | Video telephone conference between LUSTYIK and the federal prosecutors in Utah |
| 3 | 4/3/2012 | LUSTYIK emailed a federal law enforcement agent in Utah |
| 4 | 6/7/2012 (rec'd 6:21am) | LUSTYIK texted a federal law enforcement agent in Utah |
| 5 | 6/11/2012 | Telephone call between LUSTYIK and a federal law enforcement agent in Utah |
| 6 | 6/21/2012 (rec'd 12:51pm) | LUSTYIK texted a federal law enforcement agent in Utah |
| 7 | 6/21/2012 (rec'd 12:55pm) | LUSTYIK texted a federal law enforcement agent in Utah |
| 8 | 6/22/2012 (rec'd 4:55am) | LUSTYIK texted a federal law enforcement agent in Utah |
| 9 | 7/2/2012 (rec'd 10:33am) | LUSTYIK texted a federal law enforcement agent in Utah |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

23

## COUNT 10

### 18 U.S.C. §§ 1503(a), 2
### (Obstruction of the Due Administration of Justice)

105.    The allegations contained in paragraphs 1 through 8 and paragraphs 11 through 101 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

106.    From in or about October 2011, and continuing thereafter until in or about September 2012, in the District of Utah and elsewhere, the defendants,

### ROBERT G. LUSTYIK, JR.,
### MICHAEL L. TAYLOR, and
### JOHANNES W. THALER,

aided and abetted by each other, did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due administration of justice in a Federal Grand Jury in the District of Utah by using, and aiding and abetting the use of, LUSTYIK's official position as an FBI agent to undermine and impede the grand jury investigation of TAYLOR, and to persuade and influence the Utah prosecutors not to seek an indictment of TAYLOR.

All in Violation of Title 18, United States Code, Sections 1503(a) and 2.

## COUNT 11

### 18 U.S.C. § 1505, 2
### (Obstruction of Agency Proceeding)

107.    The allegations contained in paragraphs 1 through 8 and paragraphs 11 through 101 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

24

108.    From in or about October 2011, and continuing thereafter until in or about September 2012, in the District of Utah and elsewhere, the defendants,

**ROBERT G. LUSTYIK, JR.,**
**MICHAEL L. TAYLOR, and**
**JOHANNES W. THALER,**

aided and abetted by each other, did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the law under which a pending proceeding was being had, namely a federal criminal investigation being jointly conducted by the United States Department of Defense, the United States Department of Homeland Security, and the Internal Revenue Service before, by using, and aiding and abetting the use of, LUSTYIK's official position as an FBI agent to undermine and impede the investigation of TAYLOR, and to persuade and influence the Utah law enforcement agents not to further investigate TAYLOR.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## FORFEITURE ALLEGATIONS

109.    The allegations contained in paragraphs 1 through 8 and paragraphs 11 through 101 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

110.    Upon conviction of any of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 2 through 9 of this Indictment and in violation of Title 18, United States Code, Section 1503(a), set forth in Count 10 of this Indictment, or a conspiracy to

25

violate Title 18, United States Code, Sections 201, 1343, or 1503(a) as alleged in Count 1 of this Indictment, the defendants, ROBERT G. LUSTYIK, JR., MICHAEL L. TAYLOR, and JOHANNES W. THALER, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. Such forfeitable property includes a sum of money equal to the amount of proceeds obtained as a result of the offenses, for which the defendants are jointly and severally liable.

111.    If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL

_____/s/_____        10/18/12
FOREPERSON          DATE

26

DAVID B. BARLOW
United States Attorney

CARLOS A. ESQUEDA
Assistant United States Attorney

JACK SMITH, Chief
Chief, Public Integrity Section

MARIA N. LERNER
KEVIN O. DRISCOLL
Trial Attorneys
Special Assistant United States Attorneys

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture & Money Laundering Section

PAMELA J. HICKS
Trial Attorney
Special Assistant United States Attorney