IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>ROBERT G. LUSTYIK, JR.,<br>MICHAEL L. TAYLOR, and<br>JOHANNES W. THALER,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:12-CR-645-TC |

The United States has filed two motions in which it flags potential conflicts of interest on

the part of Defendant Michael L. Taylor's counsel Steven Brooks and Defendant Robert G.

Lustyik, Jr.'s counsel Raymond Mansolillo.[1]  The Defendants strongly oppose any motion to

disqualify, contending that no actual or potential conflict exists, and even if one did, it is

waivable.

On December 5, 2012, the court held a hearing to determine whether an actual or serious

potential conflict exists, and, if so, whether disqualification of either attorney is warranted.  The

court has carefully reviewed and considered the parties' briefs and evidentiary material, their oral

arguments, the court's discussion with all counsel during the hearing, and Defendants'

---

[1] See United States' Motion to Disqualify Defense Counsel Steven Brooks, or, in the
Alternative, for a Conflict Hearing (Docket No. 59); United States' Motion for a Conflict
Hearing Regarding Defense Counsel Raymond Mansolillo (Docket No. 61).

representations.  For the reasons set forth below, the court holds that disqualification is not necessary at this time if specific waivers are obtained[2] and other protective measures (described below) are in place.[3]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In this case, the Defendants have been charged with conspiracy to obstruct justice, along with other related charges (honest services wire fraud, obstruction of the due administration of justice, and obstruction of an agency proceeding).  The three Defendants—Robert Lustyik, Jr., Michael Taylor, and Johannes Thaler—allegedly engaged in a scheme to derail a criminal investigation and anticipated indictment in the District of Utah against Michael Taylor and two others for alleged fraud in the award and performance of a contract with the U.S. Department of Defense (the "Utah investigation").  The alleged scheme to disrupt the Utah investigation was unsuccessful, because on August 22, 2012, Mr. Taylor and three other defendants (David Young, Christopher Harris, and American International Security Corporation[4]), were indicted on 72 counts, including charges of government procurement fraud and bribery of a public official.  That case, United States v. David Young et al., Case No. 2:12-cr-502 (D. Utah), is referred to as the "Taylor 1" case.  Steven Brooks represents Mr. Taylor in the Taylor 1 case.

---

[2] To obtain the waivers, the court must determine, through a dialogue with each party, that the waivers sought by the United States (in lieu of disqualification) are knowingly and intelligently made.  To accomplish this, the court will hold a separate hearing in the near future to question each Defendant.

[3] The court emphasizes that if, despite all the waivers and protective measures, the court foresees problems with having a fair trial, the court may change its ruling and find that disqualification is necessary.

[4] American International Security Corporation (AISC) is Michael Taylor's company and is based in Boston, Massachusetts.

The Government alleges in this case (referred to as the "Taylor 2" case[5]) that Mr. Taylor engaged in a scheme to bribe his co-defendant Robert Lustyik, Jr., an FBI agent, in exchange for official acts aimed at persuading federal law enforcement agents and federal prosecutors (the "Utah authorities") to drop the Utah investigation.  Defendant Johannes Thaler allegedly assisted Mr. Lustyik and Mr. Taylor in the scheme.  To further the scheme, Mr. Lustyik allegedly agreed to use his position to get Michael Taylor listed as a confidential human source with the FBI.  Mr. Brooks, in an effort to defend and protect his client Mr. Taylor in the Taylor 1 case, was unwittingly pulled into certain events that constitute evidence of the scheme.  Mr. Brooks had significant communications with the Utah authorities (including Utah prosecutor AUSA Robert Lund) and, apparently, with Mr. Lustyik.  The same is true for Mr. Mansolillo, who unwittingly participated in a meeting between Mr. Taylor, Mr. Lustyik, and various DEA agents with the alleged goal of influencing the Utah investigation.

As mentioned above, Mr. Taylor is a defendant in both Taylor 1 and Taylor 2.  He is represented by the same attorneys in both cases: Steven Brooks and Daniel Deutsch (Boston-based), and local counsel Rebecca Skordas.[6]  Mr. Lustyik is represented by Raymond Mansolillo (Boston-based) and local counsel Nathan Crane and J. Michael Hansen of Stirba & Associates.  Mr. Thaler is represented by Daniel Calabro, Jr. (based in Providence, Rhode Island) and local counsel Bret Rawson and Darin Goff from Mumford Rawson PLLC.  Although the Government

---

[5] The court uses Mr. Taylor's name to refer to both cases because he is the only defendant listed in both of the indictments.

[6] A related forfeiture *in rem* case has been pending in the District of Utah since September 2011: United States v. Approximately Up To $15,253,826 In Funds Contained In Thirteen Bank Accounts (Case No. 2:11-cv-806-DAK) in which Mr. Brooks and Mr. Deutsch represent the interests of Mr. Taylor's company, AISC.

has not identified any potential conflict on the part of Mr. Calabro, the court will require (as explained below) a waiver from Mr. Thaler as well as the other defendants.

## A. Steven Brooks

The United States contends that Mr. Brooks was an unwitting participant in the alleged bribery scheme to obstruct the Taylor 1 investigation and indictment. Specifically, it contends that Mr. Brooks, in his capacity as Mr. Taylor's attorney in Taylor 1, was used by Mr. Lustyik and Mr. Taylor as a conduit[7] to pass information to Utah law enforcement agents and prosecutors in an effort to get Mr. Taylor listed as a confidential human source and to get the prosecutors to drop the investigation and anticipated indictment. According to the United States, the use of Mr. Brooks as a source of information lent "gravitas"[8] to the Defendants' effort to stop the investigation. As part of the conflict hearing, the United States presented emails, text messages, and telephone records to demonstrate the extent of Mr. Brooks's unwitting involvement in the scheme.

For example, telephone records show that between March 22, 2012, and May 12, 2012, a cellular phone used by Mr. Lustyik had 23 contacts with either Mr. Brooks's personal cellular phone or his work telephone. In addition, emails between Mr. Lustyik and Mr. Taylor refer to those conversations:

- On March 22, 2012, Mr. Lustyik texted Mr. Thaler to ask for Mr. Brooks's cell phone number (Gov't Ex. 1), and Mr. Thaler, having emailed Mr.

---

[7] Mr. Taylor attempts to make a distinction by saying Mr. Brooks was a "matchmaker," not a "conduit" of information. (Taylor's Mem. Opp'n (Docket No. 98) at 2.) The characterization of Mr. Brooks's role does not change the facts of his communications with Mr. Lustyik.

[8] United States' Reply Re: Steven Brooks (Docket No. 114) at 4.

Taylor for the number, relayed it back to Mr. Lustyik. (Gov't Ex. 2 at US00093045.)  A day later, Mr. Lustyik texted Mr. Thaler to say that he (Lustyik) "spoke w Brooks n [sic] went well." (Gov't Ex. 1.)  Telephone records confirm that Mr. Lustyik called Mr. Brooks on March 23, 2012, and the phone call lasted approximately 36 minutes.

- On March 24, 2012, Mr. Lustyik asked Mr. Taylor in an email, "[d]id you talk to Brooks?" (Gov't Ex. 3 at US00074799.)  Mr. Taylor responded, "[y]es, he [Mr. Brooks] told me you called him. [H]e said he would call Utah on Tuesday just as an informational call because his talk with you was confidential." (Id.)

- On March 30, 2012, Mr. Lustyik emailed Mr. Taylor: "Brooks should call me."  Mr. Lustyik then gave a phone number, and continued, "I want to discuss it w him [Mr. Brooks] again." (Gov't Ex. 4 at US00081694.)

- In an email dated April 1, 2012, Mr. Lustyik told Mr. Taylor: "I am calling Brooks tomorrow because I got authorization to tell him to call Utah n say u r cooperating w us. Once it comes from ur lawyer officially they r screwed. It means [another FBI agent] myself n my Boss can be witnesses on ur behalf as well." (Gov't Ex. 5 at US00081719.)

- In a series of emails dated April 2 and 3, 2012, Mr. Taylor told Mr. Lustyik that Mr. Brooks wanted to speak with him in order to "update" him. (Gov't Ex. 6 at US00093057.)  Telephone records show that Mr. Brooks called Mr. Lustyik on April 2, 2012, and that Mr. Lustyik then called Mr. Brooks later that same day.

- On April 17, 2012, Mr. Lustyik emailed Mr. Taylor to ask, "[c]an u send me Brooks cell. I want to call him quick."  (Gov't Ex. 7 at US00081734.)  Taylor responded with what was presumably Mr. Brooks's cell phone number.

- Mr. Taylor emailed Mr. Lustyik on April 27, 2012, to say that Mr. Brooks wanted to talk to Lustyik about money seized through civil forfeiture. (Gov't Ex. 8 at US00081766.)  Mr. Taylor added, "[l]ong story but [Mr. Brooks] can explain and wanted to see if there was any progress with your company."[9] (Id.)

---

[9] According to the United States, "company" refers to the FBI and "other company" refers to another federal agency.

- Mr. Taylor emailed Mr. Lustyik again on July 9, 2012: "Bob, [p]lease give Steve Brooks a call at [telephone number]." (Gov't Ex. 9 at US00093998.) Telephone records show that Mr. Lustyik sent Mr. Brooks a text message on July 10, 2012.

Also, in an email from Mr. Brooks to Mr. Taylor (which Mr. Taylor forwarded to Mr. Lustyik. thereby waiving attorney-client privilege), Mr. Brooks wrote:

> I had a very long conversation with Special Agent Lustig [sic] from the FBI. He was extremely laudatory of you and your efforts on behalf of the U.S. Government. They have been in conversation with AUSA [Robert Lund]. Basically have attempted to convince [Robert Lund] to cease prosecuting your case.
>
> Special Agent Lustig [sic] seems optimistic that such a result will occur in the next several days. I am going to wait until Tuesday to hear from [Utah prosecutor AUSA Robert Lund]. If I do not hear from him, I will call him on an informational basis. I have to do it this way since the conversation with the Special Agent was confidential and off the record.

(Gov't Ex. 10 at US00081659 (emphasis added).)  Although this email does not recount precisely what words Mr. Lustyik used to communicate to Mr. Brooks that their conversation was "off the record," any admission by Mr. Lustyik to that effect is potentially important evidence of Mr. Lustyik's intent to defraud.  See United States v. Bailey, 327 F.3d 1131, 1140 (10th Cir. 2003) ("'Intent may be inferred from evidence that the defendant attempted to conceal activity.'") (quoting United States v. Prows, 118 F.3d 686, 692 (10th Cir.1997)).

Mr. Brooks actively relayed information from Mr. Lustyik to Utah authorities.  For example, Mr. Taylor emailed Mr. Lustyik on July 6, 2012: "[Mr. Brooks] would like to know what he can say [to Utah authorities] about my work with your company and the other company joining you." (Gov't Ex. 11 at US00093990.)  And again on July 7, 2012: "Steve Brooks told me his meeting with the USA [United States Attorney] and AUSA in Utah is 11 July and he wanted

to know what to say, would this be resolved by then etc." (Gov't Ex. 12 at US00093821.) According to the United States, those emails demonstrate that Mr. Brooks was being fed information directly by Mr. Lustyik for the express purpose of communicating it to the Utah authorities.

The United States also points to a July 17, 2012 email from Mr. Lustyik to another attorney: "Can u have Brooks reach out and ask [a Utah prosecutor] to return [an agent] from [another federal agency] call?"  That attorney wrote back: "I just spoke to Steve Brooks who just hung up with [Utah prosecutor AUSA Robert Lund]."  (Gov't Ex. 13 at US00094014.)  The United States contends that this email shows Mr. Lustyik directing Mr. Brooks to put certain Utah authorities in touch with specific federal agents in order to further the obstruction scheme.

And finally, the United States contends the Mr. Lustyik and Mr. Taylor used information from Mr. Brooks to focus their obstructive efforts.  For example, Mr. Brooks repeatedly advised Mr. Taylor that someone "up high" needed to tell the Utah authorities to step down.  Mr. Taylor then told Mr. Lustyik that, "[b]ased on what [Mr. Brooks] told me [the Utah prosecutor] needs to hear it from your USA or someone up high."  (Gov't Ex. 14 at US00081275).  Mr. Taylor also told Mr. Lustyik, "Brooks said he thinks it's going to have to come from up higher."  (Gov't Ex. 15 at US00081728.)  In response, Mr. Lustyik wrote to Mr. Taylor, "We are continuing up the ladder. If [the prosecutor] wants to lose the case, he is a fool. But I am getting every person possible to call him." (Id.)

In short, Mr. Brooks, who represents Mr. Taylor in Taylor 2, has personal knowledge of activities that are the subject of the Taylor 2 Indictment.

**B.  Raymond Mansolillo**

The United States' concerns about Mr. Mansolillo are two-part: first, the Government alleges Mr. Mansolillo was an unwitting participant in the alleged conspiracy to obstruct the Taylor 1 investigation and indictment; and second, the Government alleges Mr. Mansolillo's representation of Mr. Lustyik suffers from actual and potential conflicts of interest stemming from his alleged prior representation of Mr. Taylor and Mr. Thaler.

The Government alleges that Mr. Mansolillo has first-hand knowledge of events at issue in Taylor 2.  Before Mr. Taylor's arrest, Mr. Mansolillo reached out to DEA agents to set up a meeting to discuss Mr. Taylor's potential services as a confidential human source.  The alleged aim of this meeting was to convince the DEA to use Mr. Taylor as a confidential human source which could then be leveraged to influence or assist Mr. Taylor in avoiding prosecution in Taylor 1.  The meeting occurred on September 10th, 2012, and Mr. Mansolillo allegedly participated in part of the meeting, along with Mr. Taylor, Mr. Lustyik, and various DEA agents.  It is alleged that Mr. Mansolillo and Mr. Lustyik praised Mr. Taylor's effectiveness as a confidential human source and discussed Mr. Taylor's work as a confidential source with the FBI.

And as will be explained in greater detail below, there is also a concern that Mr. Mansolillo has prior professional relationships with Mr. Taylor and Mr. Thaler.  Mr. Mansolillo has admitted that he represented Mr. Taylor during late September and early October of 2012 in the civil forfeiture case.  There are also allegations that Mr. Mansolillo represented Mr. Thaler during a similar time period.

## II.  ANALYSIS

The Sixth Amendment guarantees an effective advocate for each criminal defendant, but

it does not "ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988).  The court has a duty to ensure that the Defendants' criminal trial is "conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 160.  Accordingly, a criminal defendant's right to choose counsel is not unlimited, and may be circumscribed in specific circumstances, including when a serious potential conflict of interest arises between the defendant and his attorney.  Id. at 159; United States v. Evanson, 584 F.3d 904, 909 (10th Cir. 2009) ("a criminal defendant does not enjoy an absolute right to be represented by an attorney laboring under a conflict of interest.").

When a potential conflict of interest is raised, the court must investigate to determine whether there is an actual conflict or serious potential conflict that requires measures to protect the defendant's right to conflict-free counsel.  See Wheat, 486 U.S. at 161 ("[T]his need to investigate potential conflicts arises in part from the legitimate wish of district courts that their judgments remain intact on appeal," by, for example, avoiding a later claim by the defendant that he did not receive effective assistance of counsel during trial).  Although the court "must recognize a presumption in favor of [defendant's] counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." Id. at 164.  To resolve an actual conflict or serious potential conflict, the court may disqualify the attorney or obtain a voluntary and fully-informed waiver of the conflict from the attorney's client.[10]

---

[10] Even then, a waiver does not necessarily solve the problem, as the question of whether a waiver was knowing and voluntary is often raised on appeal.  See Wheat, 486 U.S. at 162.

**A.  Mr. Brooks**

The United States contends that Mr. Brooks's personal involvement makes him a potential witness (in its briefs, the Government calls him an "essential witness" to his conversations with Mr. Lustyik)[11] and that his planned representation of Mr. Taylor at trial raises the possibility that he would be an "unsworn witness."

1.  Potential Witness

Mr. Brooks participated in events at the core of the Taylor 2 indictment: the alleged effort to dissuade Utah authorities from indicting Mr. Taylor in the underlying fraud case (Taylor 1) using information provided by Mr. Lustyik.  This makes him a potential witness, not only for the United States but for Mr. Taylor and Mr. Lustyik.  Yet his status as Mr. Taylor's attorney would prevent Mr. Taylor and Mr. Lustyik from calling Mr. Brooks to establish some exculpatory point. See Utah Rules Prof'l Conduct R. 3.7 (preventing attorney from acting as both advocate and witness at trial absent limited circumstances).[12]  Because Mr. Lustyik is unavailable as a witness (due to his Fifth Amendment privilege against self-incrimination), the United States would be unable to call anyone but Mr. Brooks concerning communications between him and Mr. Lustyik that allegedly demonstrate Mr. Lustyik's intent to conceal the scheme.  Mr. Brooks's status as Mr. Taylor's attorney would foreclose that avenue of evidence available to the United States.

---

[11] See Docket No. 59 at 3.

[12] An exception is made if "disqualification of the lawyer would work substantial hardship on the client."  Utah Rules Prof'l Conduct R. 3.7(a)(3).  Mr. Taylor argues that disqualification of Mr. Brooks would result in substantial hardship to him, but he does not present persuasive evidence to support that claim.  Mr. Brooks has quite capable co-counsel in Taylor 2.  The conflict has been raised at a very early stage in the case.  And Mr. Brooks's role in Taylor 2 has no bearing on his representation of Mr. Taylor in the much more complex case of Taylor 1.

Although Mr. Brooks's status as a potential witness does not appear to be a significant problem, it is still a problem.  For example, although the United States, in its briefs, originally characterized Mr. Brooks as an "essential witness," the United States told the court during the hearing that it will likely not be calling Mr. Brooks as a witness during its case-in-chief.  Still the United States expressed concern about its ability to call Mr. Brooks in rebuttal if Mr. Taylor raises an advice-of-counsel defense, a situation that is not predictable at this point.  In addition, Mr. Brooks has submitted an affidavit that provides an innocuous explanation for his use of the phrase "confidential and off the record."  (See Aff. of Steven J. Brooks (Docket No. 130) ¶ 13.) Although this discounts the value of the evidence to the United States, it could provide an exculpatory explanation to support Mr. Lustyik's defense.  As the United States notes in its reply memorandum,

> The Government will argue at trial that involving Mr. Brooks in communicating
> information regarding Taylor's cooperation, and the FBI's and DOJ's alleged
> interest in Taylor's cooperation, is both an act of concealment and an act in
> furtherance of the scheme by Lustyik.  The inferences from the communications
> between Mr. Brooks and Lustyik can  be disputed at trial, and decided by the jury.
> To argue those inferences with authority, Taylor must call either Lustyik (who has
> a Fifth Amendment privilege) or Mr. Brooks.

(U.S. Reply Mem. (Docket No. 114) at 4.)

In short, the potential for Mr. Brooks to be a witness still exists.  Absent a waiver and other protective measures, the danger of impairing the parties' rights to a fair trial will continue unless Mr. Brooks is disqualified.  This waivable conflict must be addressed to avoid disqualification of Mr. Brooks.

## 2.  Unsworn Witness Problem

Although the court is concerned about Mr. Brooks's potential to be a witness, the court is

even more concerned about the unsworn witness problem that arises if he represents Mr. Taylor

at trial.  The unsworn witness problem (an issue distinct from issues raised by conflicts of

interest) may require disqualification.  "'An attorney acts as an unsworn witness when his

relationship to his client results in his having first-hand knowledge of the events presented at

trial,' enabling the attorney to 'subtly impart to the jury his first-hand knowledge of the events

without having to swear an oath or be subject to cross-examination.'"  United States v. Evanson,

584 F.3d 904, 908 (10th Cir. 2009) (quoting United States v. Locascio, 6 F.3d 924, 933 (2d Cir.

1993)).

The United States's proffered evidence contains many references to Mr. Brooks.  In

addition, there is no question that Mr. Brooks had conversations with both Mr. Lustyik and the

Utah authorities about getting Mr. Taylor designated a confidential human source for the FBI and

ending the Utah investigation.

The unsworn witness problem would arise when Mr. Brooks examined any witness with

whom he had any contact regarding the topic of Mr. Taylor's cooperation with the FBI, a topic

that Mr. Taylor contends will be an important issue in this case.  These witnesses include Mr.

Lustyik, Mr. Taylor, and prosecutors from Taylor 1.  It is very likely that Mr. Brooks would be in

the position of questioning witnesses about conversations that he had with the witnesses, or about

information regarding Mr. Taylor's purported cooperation that Mr. Brooks learned from either

Mr. Lustyik or Mr. Taylor.

Such a situation would disadvantage the United States and undermine the fairness of the

proceedings.  During trial, presentation of evidence that mentions Mr. Brooks, while Mr. Brooks

sits at counsel table, would create an appearance of impropriety.

12

In addition, Mr. Brooks might "'be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client.'"  Evanson, 584 F.3d at 909-10 (quoting Locascio, 6 F.3d at 933); see also United States v. Anderson, 319 F.3d 1218, 1222 (10th Cir. 2003) (finding that "counsel's personal involvement in this matter" gave rise to the unsworn witness problem).  Although this situation is less likely, it is a concern for the court because, forseeably, Mr. Brooks's natural and understandable response would be to distance himself from any insinuation that he was knowingly involved in the scheme alleged by the United States.  At such a point, the interests of Mr. Brooks and Mr. Taylor might diverge, creating an actual conflict of interest.  To avoid disqualification, the protective measures listed below must be implemented.

**B.  Mr. Mansolillo**

1.  Waivable Conflicts of Interest: Prior Representation and Prospective Representation

Mr. Mansolillo's representation of Mr. Lustyik raises a potential conflict of interest because of his prior representation of Mr. Taylor.  Moreover, there may be a potential conflict of interest because the record shows, at a minimum, that Mr. Thaler approached Mr. Mansolillo to assist him in some fashion in Taylor 2.

The United States District Court for the District of Utah has adopted the Utah Rules of Professional Conduct, and Rule 1.9 provides, in pertinent part:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Utah Rules Prof'l Conduct R. 1.9(a).  Under that rule, a party seeking disqualification must

establish that: "(1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is 'substantially related' to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant."   United States v. Stiger, 413 F.3d 1185, 1196 (10th Cir. 2005) (quoting Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1383 (10th Cir. 1994)).  "If the movant establishes the first two prongs, an irrebuttable 'presumption arises that a client has indeed revealed facts to the attorney that require his disqualification.'" Id. (quoting Smith v. Whatcott, 757 F.2d 1098, 1100 (10th Cir. 1985)).

Based on the information available to the court, as shown below: (a) Mr. Mansolillo had an attorney client relationship with Mr. Taylor, and perhaps Mr. Thaler; (b) the present litigation involves a matter that is substantially related to the subject of Mr. Mansolillo's prior representation of Mr. Taylor, and perhaps Mr. Thaler;(c) the interests of Mr. Mansolillo's present client—Mr. Lustyik—are potentially adverse to Mr. Taylor and Mr. Thaler; (d) even if Mr. Thaler did not have an attorney-client relationship with Mr. Mansolillo, there is still a potential conflict arising from Mr. Mansolillo's duties to Mr. Thaler as a prospective client, and (e) Mr. Mansolillo's conflict of interest may detrimentally affect his currently client, Mr. Lustyik.

### a.  Mr. Mansolillo Had an Attorney-Client Relationship with Mr. Taylor, and Perhaps Mr. Thaler

As admitted by Mr. Mansolillo, it is clear he once represented Mr. Taylor.  But because of conflicting statements by the Government, Mr. Mansolillo, and Mr. Thaler, it is less clear whether Mr. Mansolillo once represented Mr. Thaler.

Mr. Mansolillo has unequivocally stated that he had an attorney-client relationship with

14

Mr. Taylor.  When the court heard arguments at the December 5th hearing, the question was raised whether nine recorded calls (while Mr. Taylor was in custody) between Mr. Mansolillo and Mr. Taylor in late September and early October of 2012 contained privileged information. At the hearing, Mr. Mansolillo confirmed that the calls were protected by attorney-client privilege at the time they were made because he represented Mr. Taylor in the related civil forfeiture case.  Clearly then, Mr. Mansolillo formerly represented Mr. Taylor.

The more difficult question is whether Mr. Mansolillo once represented Mr. Thaler.  An attorney-client relationship is usually formed after entering into a formal contract of representation or the payment of legal fees; however, those steps are not required per se.  See Stiger, 413 F.3d at 1196.  Instead, an attorney-client relationship can be formed simply through the conduct of the parties.  See id.  For example, the client's conduct alone can form an attorney-client relationship if she provides confidential information to the attorney.  See id.  Or the attorney's conduct—along with other factors—can be used to demonstrate that there was attorney-client relationship, such as if the attorney holds himself out to third-parties as representing the client, or renders service to the client free of charge.  See Davis v. State Bar, 655 P.2d 1276, 1278 (Cal. 1983) (mailing letters to third-parties in which an attorney claimed he represented the client was evidence of an attorney-client relationship); Sotelo v. Stewart, 281 S.W.3d 76, 81 (Tex. App. 2008) (rendering gratuitous professional services implies an attorney-client relationship).

According to the Government, on September 24th, 2012, Mr. Mansolillo informed Government counsel that he represented both Mr. Lustyik and Mr. Thaler.  (U.S. Mot. for Conflict Hr'g 4, Oct. 29, 2012, ECF No. 61.)  Also according to the Government, on October 18,

2012, Mr. Mansolillo informed Government counsel that he no longer represented Mr. Thaler because Mr. Thaler had retained new counsel.  (Id.; see also Government's Response to Def.'s Objection to U.S. Mot. for Conflict Hr'g 7–8, Dec. 3, 2012, ECF No. 133 (noting that even though Mr. Mansolillo and Mr. Thaler deny ever forming an attorney-client relationship, those "assertions are inconsistent with representations made by Mr. Mansolillo to the government on or about September 25, 2012").)  Moreover, Mr. Mansolillo states that "[p]rior to Thaler's engagement of Attorney Daniel Calabro, Mr. Mansolillo only interceded on Thaler's behalf to assist Thaler until he retained counsel . . . ."  (Def.'s Objection to U.S. Mot. for Conflict Hr'g 3, Nov. 28, 2012, ECF. No. 125 (emphasis added).)  If the above is accurate, Mr. Mansolillo's conduct implies the existence of an attorney-client relationship between Mr. Mansolillo and Mr. Thaler, even though no contract may have been signed or any fee paid.

However, Mr. Mansolillo and Mr. Thaler emphatically maintain the opposite: that they never had an attorney-client relationship.  Mr. Mansolillo argues in his brief that he never discussed the case with Mr. Thaler.  (Id. at 3, 7.)  Mr. Thaler states in an affidavit that he only spoke with Mr. Mansolillo to get recommendations for other attorneys, that he never discussed the case with Mr. Mansolillo, and at no point did Mr. Thaler believe he was a client of Mr. Mansolillo.  (Aff. of Def. Johannes Thaler 1–2, Nov. 30, 2012, ECF No. 127.)  But Mr. Thaler's affidavit also implies that he discussed at least some part of the case with Mr. Mansolillo, because as stated by Mr. Thaler, "[w]hen I met with Attorney Mansolillo I asked him if I should hire an attorney.  He told me that at this point I had not been charged and if I didn't get charged or indicted I would most likely not need an attorney . . . ."  (Id. at 1.)  Whether confidential facts were discussed is not apparent, but it does appear that Mr. Mansolillo gave some legal advice

regarding this case based on the fact Mr. Thaler had not yet been charged.  This may not be enough to establish an attorney-client relationship, but when coupled with the assertions by the Government and Mr. Mansolillo's statement that he "interceded" on Mr. Thaler's behalf, it raises at least the spectre of prior representation.

The court has "an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment."  Wheat v. United States, 486 U.S. 153, 161 (1988); see also United States v. Curcio, 680 F.2d 881, 888 (2d Cir. 1982) (noting that if there is danger of a conflict arising "the court shall take measures as may be appropriate to protect each defendant's right to counsel.").  Because there is at least some possibility that Mr. Mansolillo and Mr. Thaler had an attorney-client relationship, the court deems it necessary to protect Mr. Thaler's rights to a fair and constitutionally-sound trial by apprising him of the potential conflict.

### b.  The Current Litigation is Substantially Related to the Subject of Mr. Mansolillo's Prior Representation of Mr. Taylor and the Possible Prior Representation of Mr. Thaler

Matters are substantiality factually related if "the factual contexts of the two representations are similar or related."  United States v. Stiger, 413 F.3d 1185, 1196 (10th Cir. 2005).  "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."  Id.  "If there is a reasonable probability that during the course of the earlier representation, the former client disclosed confidential information which could be used against him in the subsequent adverse representation, the two matters are considered to be substantially related."  Funplex Partnership v. F.D.I.C., 19 F. Supp. 2d 1201, 1207 (D. Colo. 1998) (citing SLC Ltd. V

17

v. Bradford Grp. W., Inc., 999 F.2d 464, 467 n.3 (10th Cir.1993)).

Mr. Mansolillo's earlier representation of Mr. Taylor in the civil forfeiture case is substantially related to the present case. The facts in the three cases—Taylor 1, Taylor 2, and the civil forfeiture—have significant overlap. The three cases are so intertwined that they are all substantially related to each other. And it is certain that Mr. Mansolillo's representation of Mr. Taylor in the civil forfeiture case led to the exchange of confidential and privileged information, as demonstrated by the nine attorney-client privileged jailhouse calls in September and October of 2012. There is a reasonable possibility that Mr. Mansolillo learned facts that may have some bearing on the Taylor 2 case. If at some point in the Taylor 2 case Mr. Lustyik's interests no longer coincided with Mr. Taylor's, Mr. Mansolillo could use those facts against Mr. Taylor, and it would be fair to say that Mr. Mansolillo had changed sides in the matter in question.

Likewise, if Mr. Mansolillo and Mr. Thaler had an attorney-client relationship, then that earlier representation is substantially related to this case. As noted above, there is a possibility that an attorney-client relationship was formed when Mr. Thaler spoke with Mr. Mansolillo about this very case. Although not clear, there is enough conflicting evidence that triggers this court's duty to take measures to protect Mr. Thaler's rights to a fair and constitutionally-sound trial. If at some point Mr. Mansolillo learned confidential facts from Mr. Thaler, and if at some point Mr. Lustyik's interests no longer coincided with Mr. Thaler's, Mr. Mansolillo could use those facts against Mr. Thaler, and it would be fair to say that Mr. Mansolillo had changed sides in the matter in question.

18

<u>c.  The Interests of Mr. Mansolillo's Current Client Are Potentially Adverse to Mr. Taylor and Mr. Thaler</u>

As for the third prong, Mr. Lustyik's interests could become adverse to Mr. Taylor and Mr. Thaler.  Taylor 2 alleges a conspiracy to derail the investigation into the alleged government procurement fraud and bribery.  Even though all three Defendants deny the conspiracy and have interests that coincide, that may change.  If one of the alleged conspirators were to cooperate with the Government and testify as a Government witness, the remaining alleged conspirators' interests would suddenly be adverse, and Mr. Mansolillo's representation of Mr. Lustyik would suffer from a conflict of interest.

<u>d.  Mr. Mansolillo May Also Have a Conflict of Interest Due to Duties Owed to Mr. Thaler as a Prospective Client</u>

Even if the facts bear out later that Mr. Mansolillo did not have an attorney-client relationship with Mr. Thaler, there is a potential conflict arising from Mr. Mansolillo's duties to Mr. Thaler as a prospective client.  Rule 1.18 of the Utah Rules of Professional Conduct provides, in pertinent part:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter . . . .

Utah Rules Prof'l Conduct R. 1.18.

19

As noted above, based on the conflicting evidence before the court, it is unclear what, if anything, Mr. Thaler disclosed to Mr. Mansolillo during their discussion about Taylor 2, and whether they discussed the possibility of forming a client-lawyer relationship.  Because the court has a duty to ensure Mr. Thaler receives a fair and constitutionally-sound trial, and because there is at least some possibility that Mr. Thaler was a prospective client of Mr. Mansolillo, the court deems it necessary to protect Mr. Thaler's rights to a fair and constitutionally-sound trial by apprising him of the potential conflict.

### e.  Mr. Mansolillo's Conflict of Interest May Detrimentally Affect Mr. Lustyik

There is also a potential conflict of interest that may occur if Mr. Mansolillo ever faces the choice of whether to help his client at the expense of Mr. Taylor or Mr. Thaler.  For example, if an attorney is asked to cross-examine a former client, there is a possibility the attorney might not engage in vigorous cross-examination in order to preserve confidences revealed to him during the prior representation, or out of a desire to protect his former client.  See United States v. Evanson, 584 F.3d 904, 910 (10th Cir. 2009).  Similarly, an attorney might face mixed emotions when faced with litigation options that will help his client but hurt former clients, and thereby be motivated to recommend litigation strategies that fall short of the zealous advocacy standard required of all attorneys.  There is also the possibility that an attorney may choose to avoid certain litigation tactics that might expose his involvement in the alleged criminal conduct.[13]  See id. at 910–11.

---

[13] If an attorney is accused of knowingly participating in the crime which is client is accused of, the attorney would face a severe conflict of interest between himself and his client that would pervade the whole proceeding, regardless of whether the attorney were innocent or not.  United States v. Fulton, 5 F.3d 605, 612–13 (2d Cir. 1993).  In such cases, courts have

Mr. Mansolillo's representation of Mr. Lustyik has the potential for these kinds of

conflicts of interest with regard to Mr. Taylor.  As noted above, they had an attorney-client

relationship.  But their relationship does not end there: they have history as friends going back

decades.  The Government contends that Mr Mansolillo feels indebted to Mr. Taylor for his help

in the past, and that their relationship demonstrates a long-time friendship dating back nearly

twenty-five years.  Mr. Mansolillo, though, takes the position that he knows Mr. Taylor only

through a handful of brief social and business encounters that are decades-old.  Mr Mansolillo

argues that until he heard of Mr. Taylor's indictment in August 2012, he and Mr. Taylor had not

interacted with one another since 1997, a span of fifteen years.  (Def.'s Objection to U.S. Mot.

Conflict Hr'g 2, Nov. 28, 2012, ECF No. 125.)  The Government presented evidence that Mr.

Mansolillo had reached out to Mr. Taylor in February 2012 to look for work, and that Mr. Taylor

responded.  This shows the two had some interaction earlier than August 2012.  Regardless of the

implications of that evidence, although they may not have regular contact now, there is sufficient

evidence showing they are more than mere acquaintances.  If Mr. Mansolillo is ever faced with

---

found that such a conflict of interest could not be waived.  See id. at 613.

 In the current case before the court, Mr. Mansolillo played at least some role in the events
that are part of the alleged conspiracy in Taylor 2.  If he were accused of wrongdoing, there is the
possibility that Mr. Mansolillo could feel "constrained from making certain arguments on behalf
of his client because of his own involvement or may be tempted to minimize his own conduct at
the expense of his client," which would require Mr. Mansolillo to be disqualified.  See Evanson,
584 F.3d at 910–11.  However, Mr. Mansolillo has never been accused of being more than an
"unwitting participant" in the alleged conspiracy.  (See U.S. Mot. for Conflict Hr'g 9, Oct. 29,
2012, ECF No. 61.)

 Therefore, based on the record before the court at this time, although Mr. Mansolillo
might face some degree of conflict of interest based on allegations of unwitting participation, it is
not so severe a conflict as to be unwaivable by Mr. Lustyik.  Cf. Fulton, 5 F.3d at 613–14 (stating
that accusations of wrongdoing that are clearly false give rise to a waivable conflict of interest).

an option that might help his client Mr. Lustyik at the expense of Mr. Taylor, it is clear to the court that Mr. Mansolillo will have to deal with conflicting motives, which has the potential to detrimentally affect Mr. Lustyik.

Similarly, Mr. Mansolillo faces the potential for a conflict of interest in connection with Mr. Thaler.  There is at least a possibility that Mr. Mansolillo might not engage in a full cross-examination of Mr. Thaler based upon Mr. Thaler's status as either a former client or prospective client.

2.  Unwaivable Conflict of Interest: Unsworn Witness

Though the lesser or potential conflicts may be waived, Mr. Mansolillo still faces the unwaivable conflict arising from his participation in some of the events at issue in Taylor 2; therefore, the court will take measures to prevent Mr. Mansolillo from acting as an unsworn witness.

As noted above, the unsworn witness problem arises when an attorney's relationship to his client includes first-hand knowledge of the events presented at trial, enabling the attorney to subtly impart to the jury his first-hand knowledge of the events without being under oath or subject to cross-examination.  See United States v. Evanson, 584 F.3d 904, 908 (10th Cir. 2009).

Mr. Mansolillo has first-hand knowledge of some of the facts that may be presented at trial in Taylor 2.  The Government alleges Mr. Mansolillo initiated and participated in a meeting with government agents to influence the Utah investigation.  Though the Government concedes that Mr. Mansolillo is not a "necessary witness" because other persons will testify to the events at that meeting, because Mr. Mansolillo has some first-hand knowledge of those events, he could be an unsworn witness when cross-examining witnesses about these subjects.  To avoid

22

disqualification, the protective measures listed below must be implemented.

## C.  Waivers and Other Protective Measures

If the conflict of interest is so severe as to indicate per se that representation will be impaired, the court can do nothing less than disqualify counsel.  See United States v. Perez, 325 F.3d 115, 125–26 (2d Cir. 2003) (noting the narrow set of circumstances when conflicts are unwaivable, such as when "no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation."). However, if the conflict is one that the court determines is a lesser or only potential conflict, then the court may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel.  Id. at 125.

The court must take affirmative steps to determine whether a conflict of interest can be knowingly and intelligently waived.[14]  United States v. Winkle, 722 F.2d 605, 611 (10th Cir. 1983).  "'In order for a defendant effectively to waive his right to conflict-free counsel, the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel.'"  Id. (quoting United States v. Martinez, 630 F.2d 361, 364 (5th Cir. 1980) (internal citations omitted)).

The court will hold a hearing to engage in such a colloquy with each of the Defendants

---

[14] A valid waiver must include "informed consent," which Utah defines as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonable available alternatives to the proposed course of conduct."  Utah Rules Prof'l Conduct R.1.0(f).

who, to avoid disqualification of counsel based on a conflict of interest, must execute a waiver. In the meantime, the court anticipates that the following protective measures (and approval of them by the parties) will be required in order for Mr. Brooks and Mr. Mansolillo to continue as counsel in this case:

- Mr. Brooks will not examine any witness with whom he had first-hand communications concerning the Taylor 1 case.

- Mr. Mansolillo will not examine any witness concerning facts of which he had first-hand knowledge, including any of the individuals present at the September 10th, 2012 meeting, such as Mr. Taylor, Mr. Lustyik, or the various DEA agents.

- Co-counsel for Mr. Brooks and Mr. Mansolillo must examine witnesses whom Mr. Brooks and Mr. Mansolillo are barred from questioning.

- Mr. Brooks's and Mr. Mansolillo's names must be masked from the jury through, for example, redactions or edits on printed exhibits and instructions to every witness to refer to the attorneys in a generic fashion, not mentioning either by name.

- The court must obtain knowing and intelligent waivers of the actual or potential conflicts from Mr. Taylor, Mr. Lustyik, and Mr. Thaler.

- Mr. Taylor must affirmatively waive any advice-of-counsel defense.

- No party may call Mr. Brooks as a witness.

- No party may call Mr. Mansolillo as a witness.

All of the above measures must be memorialized on the record, including evidence that each

Defendant has agreed to the waiver after consultation with unconflicted counsel.

Despite all of the above protective measures, the court's decision to deny requests to disqualify is contingent on the parties' ability to receive a fair trial. Disqualification may be necessary in the future if the court foresees problems in obtaining a fair trial. Though a defendant may choose to waive his right to conflict-free counsel, the court "has a continuing obligation . . . to guard against conflicts of interest that may worsen as circumstances change during the course of the representation." United States v. Migliaccio, 34 F.3d 1517, 1528 (10th Cir. 1994) (quoting United States v. Akinseye, 802 F.2d 740 n.3 (4th Cir. 1986)). Thus, a once-valid waiver may later become insufficient, and the court may require an additional waiver, or even disqualify the attorney regardless of the waiver. See United States v. Evanson, 584 F.3d 904, 909 (10th Cir. 2009) ("Even when a defendant seeks to proceed with conflicted counsel by waiving the conflict, a district court retains authority to reject the proffered waiver to preserve ethical standards and ensure a fair trial."). In the event that the court determines that, despite all the above protective measures, a fair trial cannot be had with Mr. Brooks and Mr. Mansolillo at counsel table during trial, co-counsel must agree and be prepared to take over completely at trial. The court notes that **no** continuance of trial will be allowed if this scenario occurs.

If the above requirements are met, the court declines to disqualify either Mr. Brooks or Mr. Mansolillo at this time.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      The United States' Motion to Disqualify Defense Counsel Steven Brooks, or, in the Alternative, for a Conflict Hearing (Docket No. 59) is GRANTED IN PART AND DENIED IN

PART.  As noted above, the court did hold a hearing, but the court DECLINES TO DISQUALIFY MR. BROOKS AT THIS TIME **on the condition that certain protective measures (described above) are implemented.**

2.      The United States' Motion for a Conflict Hearing Regarding Defense Counsel Raymond Mansolillo (Docket No. 61) is GRANTED.  As noted above, the court did hold a hearing as the United States requested, but the court DECLINES TO DISQUALIFY MR. MANSOLILLO AT THIS TIME **on the condition that certain protective measures (described above) are implemented.**

3.      A hearing to review the issues with all involved and obtain the necessary waivers will be held on **Friday, February 1, 2013, at 10:30 a.m.**  All of the Defendants must be present.

DATED this 17th day of December, 2012.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
U.S. District Court Judge