DAVID B. BARLOW, United States Attorney (#13117)
CARLOS A. ESQUEDA, Assistant United States Attorney (#5386)
185 South State Street, Suite 300
Salt Lake City, Utah 84111-1506
Telephone:  (801) 524-5682; Facsimile:  (801) 524-6924

JACK SMITH, Chief, Public Integrity Section, Department of Justice
MARIA N. LERNER, *Trial Attorney*
KEVIN O. DRISCOLL, *Trial Attorney*

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture & Money Laundering Section, Department of Justice
PAMELA J. HICKS, *Acting Deputy Chief*
ANN MARIE BLAYLOCK BACON, *Trial Attorney*

*Attorneys for the United States*

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT G. LUSTYIK, JR.,<br>MICHAEL L. TAYLOR, and<br>JOHANNES W. THALER,<br><br>Defendants. | Case No.  2:12-cr-645 (TC) (DBP)<br><br>**GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE AND FOR HEARING ON MOTION** |

The United States, by and through undersigned counsel, respectfully moves this Court to revoke defendant Robert Lustyik's conditions of release and detain him without bond pending trial, pursuant to 18 U.S.C. § 3148(b)(1).  The United States further requests that the Court hold a hearing on this motion as soon as practicable.  As described in detail below, the Government believes there is clear and convincing evidence that defendant Lustyik has violated several of his conditions of release by, among other things, meeting with at least one potential witness in this

case; speaking with that same potential witness on the phone (actually a violation of *two* conditions of release—his use of the phone, and contacting a witness); contacting that potential witness through a third party; giving that witness $26,000 in cash through the third party; failing to secure the bond on which he has been released; and signing a false declaration on the release form that he signed after his initial appearance. The Government submits that, in light of these apparent violations and the conduct charged in the indictment, there is no condition or combination of conditions of release that will assure the safety of the community. Furthermore, these apparent violations clearly demonstrate—occurring as they did while Lustyik was on pretrial release subject to very strict conditions—that Lustyik is unwilling to abide by any condition or combination of conditions of release this Court imposes on him, 18 U.S.C. § 3148(b)(1)(B) and (b)(2). Accordingly, this Court should revoke Lustyik's bond and order him detained pending trial.

## I.   STATEMENT OF FACTS

### A.   *Procedural History*

Lustyik was arrested on Saturday, September 29, 2012, in the Southern District of New York (S.D.N.Y.), pursuant to the Second Amended Felony Complaint filed in this District in *United States v. Taylor, et al.,* 2:12-mj-260-PMW. Dkt. 23. The Second Amendment Complaint—and the indictment subsequently returned on October 18, 2012—charged Lustyik with concocting an extensive scheme with his co-defendants Michael Taylor and Johannes Thaler to impede or altogether derail a criminal investigation into Taylor in the District of Utah (which resulted in the indictment of Taylor in *United States v. Young, et al.,* 2:12-cr-502-TC, or "Taylor 1"). The purpose of the scheme concocted by Lustyik and his coconspirators, in Lustyik's own words, was to "crush" the Utah agents and prosecutors and "blow the doors off"

their criminal investigation in Taylor 1.  In exchange for official actions Lustyik took in his official capacity as an FBI agent to obstruct the Taylor 1 case, Taylor promised that he would make Lustyik and Thaler millions of dollars, provided he (Taylor) did not go to jail.  Lustyik and his co-conspirators were explicit—sometimes brazenly so—in linking the promises of future payments with official actions designed to impede or derail the Taylor 1 case, and they were relentless in their pursuit of the common goal of obstructing the Taylor 1 investigation in order to enrich themselves.

Lustyik's dogged pursuit of the scheme, which continued at least through Taylor's initial appearance before Magistrate Judge Brook Wells on the First Amended Complaint filed in this case (also under 2:12-mj-260-PMW), demonstrated why he was a severe threat of continued obstructive conduct if he were not detained pending trial.  As a result, at the same time the Government filed the Second Amended Felony Complaint, it filed a motion to detain Lustyik without bond pending trial pursuant to 18 U.S.C. § 3142(f)(2).  Dkt. 28 (a copy is attached as Exhibit 1).[1]

Lustyik was presented before Magistrate Judge Frank Maas in the S.D.N.Y. on Monday, October 1, 2012, and was represented by his current counsel, Raymond Mansolillo, at that presentment.  At that hearing, Magistrate Judge Maas heard the Government's proffer and argument on the motion to detain Lustyik.  Magistrate Judge Maas denied the Government's motion, but subjected Lustyik to very strict conditions of release and ordered him to surrender himself in the District of Utah.  The conditions of release established by Magistrate Judge Maas are attached here as Exhibit 2.

---

[1] The Government incorporates here the factual background and arguments made in its initial motion to detain Lustyik, attached as Exhibit 1 to this motion, and does not repeat those facts and arguments here.  Instead, the Government focuses here on the facts that have come to light only after Lustyik was released on the strict conditions outlined below.  The Government submits that those facts attest to the Government's justifiable concern that Lustyik would continue to obstruct justice—and commit other crimes—if he were permitted to remain on release.

The Government appealed Magistrate Judge Maas' denial of its motion to detain Lustyik. On October 3, 2012, following a de novo hearing, Chief Judge Ted Stewart issued a Memorandum Decision and Order, attached here as Exhibit 3 (hereinafter "Mem. and Order"), denying the Government's appeal and establishing Lustyik's conditions of release in the District of Utah.  Specifically, Chief Judge Stewart upheld Magistrate Judge Maas' decision, adopted all the conditions established by Magistrate Judge Maas, and added several additional conditions.

On October 18, 2012, a federal grand jury in the District of Utah returned an indictment, charging Lustyik and his co-defendants with eleven counts:  one count each of conspiracy, obstruction of justice, and obstruction of an agency proceeding, as well as eight counts of honest services wire fraud.  Lustyik was arraigned on the indictment on October 30, 2012.

  B.    *Lustyik's Conditions of Release*

After the de novo hearing on the Government's appeal from Magistrate Judge Maas' order releasing Lustyik pending trial, Chief Judge Stewart set the following conditions of release for Lustyik (among others):

> 5.  The defendant must avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution.
> *****
> 7.  The defendant may not use or have access to a telephone or computer, though a telephone and/or computer may remain in his home for use by other family members. The defendant is required to make the telephone and/or computer available to pretrial services so that they may ascertain whether he has used either in violation of these conditions.
> *****

Mem. and Order at pp. 6-7

The conditions in Magistrate Judge Maas' order that are not specifically repeated in Chief Judge Stewart's Mem. and Order are:

1. Personal recognizance bond is to be co-signed by three financially responsible persons (his mother, wife, and brother) and secured by his home and his mother's home; and

2. The bond is to be secured no later than October 12, 2012.

At the end of the hearing on October 3, 2012, Chief Judge Stewart made it very clear to Lustyik that nothing short of strict compliance with his conditions of release would be tolerated:

THE COURT:   Now, Mr. Lustyik, I need to tell you this. If you violate the terms of your supervision in any respect, this Court will be very quick to have you taken into custody. Do you understand that?

MR. LUSTYIK:   Yes, sir, I do.

   a.   *Factual Background*

Over the past several weeks, the Government has uncovered evidence of multiple violations of Lustyik's conditions of release.  The evidence the Government has uncovered falls into two principal categories:   first, evidence regarding Lustyik's violation of the strict limitations the Court placed on Lustyik's communication with witnesses in the case and on his use of a telephone and other communications devices, and, second, evidence regarding Lustyik's failure to comply with the requirement that he pledge his house as security for his appearance bond.  We describe each in turn.

Evidence uncovered in recent weeks indicates that Mr. Lustyik has violated the Court's strictures against both his contact with witnesses (whether direct or indirect) and his use of a telephone.  As described in the Second Amended Complaint on which Lustyik was originally arrested, Lustyik and his coconspirators used Company A, a recently formed entity, to pursue the lucrative business opportunities promised by Taylor in exchange for official actions by Lustyik intended to derail the Taylor 1 investigation.  Dkt. 23 at ¶ 64.  As Company A's founder, Witness One was intimately involved in the pursuit of business opportunities with Lustyik and

his co-conspirators, and at one point travelled to Lebanon with Johannes Thaler to meet with Michael Taylor.

Witness One was interviewed by the Government on December 11, 2012.  In the course of that interview, Witness One informed the Government, among other things, that Witness One was present at Lustyik's residence on September 19, 2012, the day after the residence was searched by agents in connection with this case, and that Lustyik told Witness One (either on that day or at a subsequent meeting described below) to expect to be contacted by federal agents in connection with this case—indicating that Lustyik was aware that Witness One is, in fact, a potential witness in this case.

Witness One further told the Government that a few weeks before Lustyik's house was searched, Witness One had, with Lustyik's assistance, received an investment of $60,000 in Company A from an acquaintance of Lustyik's.  After receiving this $60,000 investment, Witness One then provided Lustyik with a portion of the funds—$26,000 in cash—ostensibly to help Lustyik pay for an urgent medical procedure for Lustyik's minor child, a procedure that Lustyik had told Witness One was due to be performed in early October.  Witness One has provided the Government with bank records that document both the $60,000 deposit (on August 28, 2012) into Company A's account as well as a $26,000 withdrawal from the same account on September 6, 2012.  In addition, contemporaneous emails between Lustyik and Witness One document discussions between the two regarding both the investment by Lustyik's acquaintance in Company A and Lustyik's request for $26,000 from Witness One.  These financial transactions form the backdrop against which the subsequent contacts between Lustyik and Witness One—contacts in violation of Lustyik's conditions of release—played out.

Specifically, Witness One told the Government that, upon returning from overseas travel in or about early October, Witness One learned that Lustyik had been arrested and went to visit Lustyik at his home in New York.  According to Witness One, Lustyik had recently returned from Utah, and thus, was by this time already subject to the conditions of release imposed by this Court, as evidenced by the ankle bracelet Witness One said Lustyik was wearing during their meeting.  According to Witness One, the visit was brief, and the two discussed the surgery that Lustyik's minor child was apparently supposed to have in early October.

Approximately two weeks after this visit, in or about mid-October 2012, Witness One received a cell-phone call from a number he did not recognize.  When Witness One answered the call, a voice Witness One recognized as Lustyik's asked Witness One, "Do you recognize this voice?" or words to that effect.  Apparently, Lustyik then handed the phone to a second individual Witness One did not recognize.  That second individual identified himself as a friend of Lustyik's and asked Witness One if he could bring Witness One something from Lustyik.  At some point after that call, according to Witness One, a man arrived at Witness One's residence and handed Witness One a bag containing $26,000 in cash.  Witness One further told the Government that upon receiving the cash, he deposited a portion of it into a bank account and retained the rest.  Bank records provided by Witness One show that he deposited $15,000 in cash on or about October 26, 2012.

Witness One further provided the Government with the number from which this telephone call was apparently made.  Records for the number show no contacts with Witness One's cell phone before October 16, 2012.[2]  Moreover, the phone records indicate that the

---

[2]   The Government has sought to corroborate Witness One's testimony with independent records wherever possible because Witness One's credibility generally (and specifically his ability to recall specific events) is somewhat limited by the fact that he has mental health issues—for which he apparently has been hospitalized in the past—and takes medications that have an effect on his memory.

number that contacted Witness One belongs to a second potential witness in this case, Witness Two, who lives in the same town as Lustyik and has a close relationship with Lustyik.  The close relationship between Lustyik and Witness Two is evident in their email communications with each other—including at least one email quoted in the Second Amended Complaint that was the basis for the arrest warrant for Lustyik.  In that email, Lustyik informed Witness Two that he had "made us all stinking rich!!!!" as a result of his business pursuits with co-defendant Johannes Thaler (and by implication, Michael Taylor).   Dkt. 23 at ¶ 104.  The business pursuits Lustyik refers to, of course, form the crux of the corrupt scheme charged in the indictment.

On January 9, 2013, the Government interviewed Witness Two at his residence in New York.  Witness Two confirmed a longstanding friendship with Lustyik, who had coached Witness Two in youth football.  Witness Two denied that Lustyik had ever used his telephone to contact Witness One.  After initially denying any contact himself with Witness One, Witness Two admitted that he had, at Lustyik's direction, delivered a bag to Witness One's residence— though Witness Two denied knowing what was in the bag.

In addition to the violations involving his contact with potential witnesses and use of a telephone, the Government has uncovered evidence that Lustyik has violated his conditions of release by failing to post his residence as security for his appearance bond.  When he was released on $2 million dollar bond by Magistrate Judge Maas in the S.D.N.Y, Lustyik was ordered to secure that bond by pledging his home.  The appearance bond stated, on the very first page as well as the page titled "ADDITIONAL CONDITIONS OF RELEASE," that Lustyik was to secure the bond with the residence by "10/12/12."  (Ex. 2 at 1, 6 (numbered "Page 5" at the top))  Furthermore, in order to be released on those conditions, Lustyik was required to sign the following declaration:

8

*Ownership of the Property.* I, the defendant – and each surety – declare under penalty of perjury that:

(1) all owners of the property securing this appearance bond are included on the bond;

(2) the property is not subject to claims, except as described above; and

(3) I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.* I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me. I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true.  (See 28 U.S.C. § 1746.)

Ex. 2 at p. 3.  Immediately below the last sentence above, Lustyik affirmed this declaration by signing the Appearance Bond on October 1, 2012.

During the last week of November, after being contacted by an attorney who stated that he represented Lustyik's ex-wife and that she had a claim to the house in which Lustyik lives, the Government reviewed the property records for Lustyik's house.  That review revealed that, as of November 30, 2012, Lustyik had not secured the appearance bond with his house as the Court had required him to do—that is, there was no indication in the property records that Lustyik had pledged the home to secure his appearance bond.  Furthermore, the records search also revealed that the house was owned by Lustyik and "Catherine B. Lustyik"—Lustyik's ex-wife.   In addition, the property records indicated that at least three *lis pendens* had been filed on the property title.  Two of these appear to be mortgages.  The third *lis pendens* was filed on July 11, 2011, by Lustyik's ex-wife in connection with a complaint she had filed regarding the property.  Thus, despite the fact that Lustyik signed, under the penalty of perjury, that "all owners of the property securing this appearance bond are included on the bond," and that "the property is not

subject to claims," his ex-wife's signature is not on the appearance bond.  In addition, neither the mortgages nor her claim regarding the property are disclosed as required.

On December 7, 2012, in an effort to resolve this matter without the need for the Court's intervention, the Government sent a letter to Lustyik's counsel via the email address that is on file with the Court's ECF system.  This letter, and the cover email, are attached as Exhibit 4.  In that letter, the Government informed counsel that it could not find any indication that Lustyik's residence was securing his $2 million bond—as required by the Court's order—and asked counsel to provide evidence by December 14, 2012 that the bond had been properly secured. The Government also asked counsel to confirm whether, as Lustyik certified on his appearance bond under penalty of perjury, it was true that "all owners of the property securing this appearance bond are included on the bond."

On December 17, 2012, Lustyik's counsel filed on the docket a letter addressed to Chief Judge Stewart that purported to respond to the Government's Letter of December 7, 2012.  Dkt. 157.[3]  Although the letter makes many factual allegations regarding the status of the property and assures the Court that Lustyik is in compliance with his conditions of release, nowhere does it indicate that the property has been properly posted to secure the bond.  It also concedes that Lustyik's ex-wife has a property interest in the residence, but nevertheless argues that her interest is the subject of a dispute that is soon to be resolved.

Despite counsel's assurances that Lustyik was in compliance with his conditions of release, a second search of property records on January 3, 2013 revealed that Lustyik's residence not only had not been pledged, it was still subject to the *lis pendens* filed by Lustyik's ex-wife on

---

[3]  This letter was subsequently sealed because it contained information about confidential financial matters. Accordingly, the Government does not here discuss any of the confidential information that served as the basis for sealing the letter.

July 11, 2011.[4]  A third search conducted on January 14, 2013 indicated that there were no changes to the status of the property.  Lest there be any doubt about whether Lustyik was aware of both the need to pledge his home and the process for doing so, the Government conferred with Pretrial Services in the Southern District of New York—the agency with primary responsibility for the day-to-day supervision of Lustyik—both before and after it sent its December 7 letter to Mr. Mansolillo.  The SDNY Pretrial Services officer assigned to Lustyik's case has informed the Government that he told Lustyik on more than one occasion that he was required to properly pledge his residence to secure his bond, and explained to him the process for doing so.  (In the Southern District of New York, that process requires Lustyik to file a lien on the property with the county clerk on the Government's behalf, and then provide paperwork to the Government demonstrating that he has done so.)  The Pretrial Services officer has further informed the Government that he is prepared to submit an affidavit to that effect, should the Court so desire.

## 8. ARGUMENT

The facts outlined above demonstrate that, despite Chief Judge Stewart's stern warning to him that "[i]f you violate the terms of your supervision in any respect, this Court will be very quick to have you taken into custody," Lustyik has violated his terms of supervision not in "any" respect, but in *multiple* respects.  One of those violations—his failure to post his house as security for his appearance bond—is ongoing, despite the fact that both Lustyik and his counsel have been notified by the Government as well as his Pretrial Services officer of his need to post the house as ordered by the Court.  While it should go without saying that the Government here describes only those violations of which it is aware, the Government nevertheless notes that, even despite the conscientious efforts of Pretrial Services in both SDNY and the District of Utah

---

[4]  Thus, it is apparent that the dispute over the property predated Lustyik's arrest and his signing of the bond by well over a year.

to monitor Lustyik's compliance with his conditions of release, these violations were only uncovered through the Government's ongoing investigation of this case.

This disregard of his conditions of release—by a defendant who only recently retired from a 24-year career in law enforcement—clearly demonstrates that, as the Government argued in its initial motion, Lustyik is a continued threat of obstruction of justice, contacting witnesses in *this* case.  It also clearly demonstrates that no matter how strict the conditions placed upon him, no matter how stern the warning from the Court, and no matter how closely and carefully Pretrial Services supervises him, he will not abide by the conditions of his release.  For these reasons, the Court should revoke his conditions of release and detain him pending trial in this matter.

> a.      *Applicable Law*

A defendant who has violated any of his conditions of release "is subject to a revocation of release, an order of detention, and a prosecution for contempt of court."  18 U.S.C. § 3148(a). The Government may move for revocation of an order of release by filing a motion with the district court, and the Court "shall enter an order of revocation and detention," 18 U.S.C. § 3148(b), if after a hearing, the Court:

(1) finds that there is—

    (A)    probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

    (B)    clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that—

    (A)    based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

    (B)    the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b).  Thus, the statute requires the Court to engage in a two-stage analysis:  First, the Court must determine whether there is either (A) probable cause to believe the person has committed a crime while on release or (B) clear and convincing evidence that the person has violated any other condition of release.  If the Court finds either of these factors satisfied, the Court must then find whether (A) there is no condition or combination of conditions that will assure that the person does not pose a danger to the community; or (B) even if there are such conditions or combination of conditions, the person is unlikely to abide by them.  In considering whether there are conditions or combinations of conditions of release that will assure the safety of the community, the Court must consider the four factors enumerated in 18 U.S.C. § 3142(g):

(1)  the nature and circumstances of the offense charged . . .;

(2)  the weight of the evidence against the person;

(3)  the history and characteristics of the person, including—

    (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In evaluating a defendant's threat of safety to the community, "[t]he concern about safety is to be given a broader construction than the mere danger of physical violence.  Safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community."  *United States v. Cook,* 880 F.2d

1158, 1161 (10th Cir. 1989) (internal quotations and citations omitted).

   **b.** *There is clear and convincing evidence that defendant Lustyik has violated several of his conditions of release.*

   In just the first several weeks of his release on conditions in this case, Lustyik managed to accumulate at least five violations of his conditions of release.  The evidence of each of these violations is clear and convincing, and the violations themselves are serious, further demonstrating Lustyik's ongoing disregard for this Court and the grave risk of continued obstruction of justice that he poses should he remain free pending trial.

   **i.**  Meeting with Witness One soon after Lustyik's arrest

   There can be no doubt that Witness One is, in fact, a witness in this case—if for no other reason than that, according to Witness One, Lustyik himself ***told*** Witness One that he should expect to be contacted by federal agents in connection with the charges against Lustyik and his co-conspirators.  Despite Lustyik's awareness that Witness One may be a witness, however, and despite the fact that Lustyik was ordered not to have any contact with "any person who is or may be a witness or victim in this prosecution," Mem. and Order at 6-7, Lustyik nevertheless met with Witness One at Lustyik's home mere days after he was released pending trial.  While the meeting was brief, Lustyik apparently made no effort to turn Witness One away, and the two men discussed the $26,000 in cash that Witness One had provided Lustyik, purportedly for an urgent surgery that Lustyik's minor child was scheduled to undergo.

   **ii.**  Telephonic contact with Witness One

   While Lustyik apparently had no compunction about meeting Witness One at his home in or about early October, at some point thereafter he appears to have at least recognized that his contact with Witness One was problematic.  For, according to Witness One, the next time he heard from Lustyik was by telephone, on or about October 16, 2012, when Witness One received

a phone call from an unknown number, only to be greeted by Lustyik's voice on the other end of the line asking Witness One if Witness One knew who was calling.  Lustyik did not identify himself by name, which itself is further evidence that Lustyik was aware of the violations he was committing by using the phone and contacting a witness.  Nevertheless, Witness One recognized Lustyik, and Lustyik promptly handed the phone to another individual who introduced himself as a friend of Lustyik's who had been asked to deliver something from Lustyik to Witness One. While the individual later identified as Witness Two has denied that Lustyik used his phone to communicate with Witness One, his denial lacks credibility because of his close, personal relationship with Lustyik.  Indeed, unimpeachable independent evidence, in the form of phone records, demonstrates that there was no contact whatsoever between Witness One's phone number and Witness Two's before the contact described here, a fact that corroborates Witness One's statement.  Lustyik, aware that he was forbidden to contact Witness One, nevertheless did so, but made sure the contact took place through an intermediary in an effort to make the contact more difficult to detect.  Furthermore, other statements by Witness Two also undermine his denials in this regard, specifically the fact that he initially could not even remember Witness One's name, yet later, when confronted with the phone records showing multiple contacts between his and Witness Two's phone, claimed that he and Witness One had become friendly. There have in fact been more than 100 contacts between Witness One's and Witness Two's phones in the time period between October 16, 2012, and December 12, 2012.  These contacts include phone calls as well as text messages.  As noted above, there had previously been no contact between the two phones prior to October 16, 2012, and Witness One has stated he did not know of Witness Two prior to that time.  The only common denominator between Witness One and Witness Two is Lustyik:  Lustyik has a close personal relationship with Witness Two, and a

personal and business relationship with Witness One; and both Witness One and Witness Two are potential witnesses in the case now pending against Lustyik.[5]

### iii.        Contact with Witness One through Witness Two

Even if the Court credits Witness Two's denial that Lustyik never used his telephone to communicate with Witness One, Witness Two's admission that he contacted Witness One at Lustyik's direction and delivered a bag to Witness One from Lustyik itself establishes a violation of Lustyik's conditions of release. Those conditions bar Lustyik from contacting—"directly *or indirectly*," Mem. and Order at 6-7—anyone who is or may be a witness in this case. Thus, despite his best efforts, Lustyik cannot avoid a violation of his conditions of release by having others—such as Witness Two—do for him what he is forbidden to do himself. Indeed, the fact that Lustyik attempted to conceal this contact by employing a third party is powerful evidence of Lustyik's awareness that he was engaged in conduct that violated the Court's order.

Finally, Lustyik's "return" of the money to Witness One is itself quite suspect, given that he returned this money on or about the day he was indicted, and did so despite the fact that Witness One apparently never asked for its return. Whether he was trying to eliminate any trace of payments he received while he was an FBI agent, or whether he was trying to stay in the good graces of a potential witness against him, or otherwise hide assets, there is no innocent explanation for Lustyik's actions.

### iv.        Despite clear orders from both Magistrate Judge Maas and Chief Judge Stewart, Lustyik has failed to secure his bond with his residence.

Both Magistrate Judge Maas and Chief Judge Stewart expressed concern at the seriousness of the allegations against Lustyik, and while they denied the Government's motion to

---

[5] While Witness One has told the Government that Lustyik communicated with him by phone on one occasion, he has denied that he had any other telephone communications—either direct or indirect—with Lustyik. Witness Two has denied that Lustyik ever used his phone.

detain him, they both ordered him to post a very high bond as a condition of releasing him. Magistrate Judge Maas' order releasing Lustyik on his personal recognizance stated that Lustyik had to post $2 million bond, to be secured by his home.  The Order stated that the posting of Lustyik's residence was to be done by October 12, 2012.  Chief Judge Stewart's Mem. and Order confirmed that Lustyik was required to post $2 million bond, and that Lustyik "must abide by all conditions previously ordered by Magistrate Judge Mass."  Ex. 3 at 6.

As of the date the Government conducted its first search of the property records, on November 30, 2012, there was no indication in the property records that Lustyik's bond was being secured by his residence.  The Government asked Mr. Mansolillo to provide evidence to the contrary, if there was such evidence, and received a response that, while asserting that Lustyik was in compliance with his conditions, was woefully short on specifics.  Indeed, Mr. Mansolillo conceded that Lustyik's ex-wife did have an interest in the property, but offered an explanation— that is, that her interest was the subject of a dispute that would be resolved shortly. Nevertheless, two additional searches of the property records, on January 3 and 14, 2013, revealed that Lustyik still has not pledged his house, and that his ex-wife still has a pending claim on the property that was not reported to Magistrate Judge Maas, Chief Judge Stewart, or Pretrial Services prior to the signing of the orders releasing him.  Accordingly, the title search correctly reflects that Lustyik has not secured the bond, and is thus in clear violation of this condition of his release.

> v.      Lustyik falsely declared on his appearance bond that "all owners of the property securing this appearance bond are included on the bond" and that "the property is not subject to claims."

Lustyik failed to report to the Court, and apparently to the pre-trial services officer who interviewed him prior to his initial appearance, that in fact one of the owners of the property he was using to secure his bond had *not* signed the appearance bond: Lustyik's ex-wife.  Indeed,

had the former Mrs. Lustyik's lawyer not contacted the Government and provided information regarding her claim on the house, the Government would not have been made aware that the property was subject to any claims.  The ex-wife's attorney informed the Government that she did in fact have a claim to the property, which is apparently still in the process of being settled.  Thus, Lustyik had not even walked out of the courthouse in Manhattan before he had violated the conditions of his release.

     c.    *No conditions or combination of conditions of release will assure the safety of the community, or assure defendant Lustyik's compliance of such conditions.*

If the Court finds that there is clear and convincing evidence that Lustyik has violated any condition of his release, the Court must revisit the factors under 18 U.S.C. § 3142(g) to determine if there is any combination of conditions that can secure Lustyik's appearance and the safety of the community, *and* the Court must also find that Lustyik will abide by those conditions of release.  18 U.S.C. § 3148(b).  Under the facts set forth in this motion, the Government contends that not only are there no conditions that will assure the safety of the community, but also that Lustyik "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B).

With respect to the § 3142(g) factors, the Government incorporates its arguments in its initial motion to detain Lustyik, and provides the following additional facts for the Court's consideration.  With respect to the weight of the evidence against Lustyik, the recitation of facts in the Government's initial motion and the evidence now provided to the defense in discovery demonstrate that it is the defendant's own words—captured in emails and text messages obtained through multiple search warrants that were executed over the course of the investigation—that indict Lustyik and his codefendants:

- On Feb. 25, 2012, Lustyik texted Thaler:  "Taylor is gonna hand u cash in Lebanon," and a few minutes later added, "[l]ike 150 gs."  When Thaler asked Lustyik how to bring

back the cash from Lebanon, Lustyik responded, "[i]n ur pants. Or wire it ? They won't stop 2 white guys at customs wo a reason," and then added, "[o]r I meet u at customs at jfk n cred u in." *Indictment* at § 23

- On March 6, 2012, Lustyik sent a text message to Thaler, stating, "[d]on't forget to mention to MT [Taylor] how hard I'm working on getting his shit pushed aside and how tough I'm having it with [Lustyik's minor child's] recent surgeries." *Indictment* at § 25.

- On April 20, 2012, Lustyik emailed Taylor and, after telling him about several calls that were purportedly being made on Taylor's behalf (presumably to the Utah federal prosecutors and agents), asked: "Can you think of anyone else that we can neutralize with an interview ? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive ? Where are Harris n Young ?" *Indictment* at § 72.

- On June 3, 2012, Lustyik and Taylor exchanged emails regarding the effect of Lustyik's efforts on the Utah investigation. Lustyik first told Taylor: "So we have got them running scared now. Their investigators are panicked about our calls n meeting w [an FBI section] and main Justice." Further on in the discussion, Taylor told Lustyik that he'd "really like to end this and rake in some serious doe [sic] on these projects here which is starting to happen." *Indictment* at § 39.

- On August 5, 2012, Lustyik emailed Taylor regarding how they could "make some quick coin" by brokering gold sales to a friend of Lustyik's. Taylor responded by telling Lustyik that "[q]uick coin is the easy part of this. Right after Ramadan it all starts rolling for us. 40 drill sites, Oil well service which is starting now and the Buckeye. You will have more coin than you know what to do with. You were wise to turn down [the private sector job]." *Indictment* at § 46

- On August 6, 2012, after Lustyik wrote to Taylor, "[l]et's just get Utah over with and get stinking rich," Taylor replied: "Getting stinking rick [sic], we are well on the way with that so I have the ball." Two days later, on August 8, 2012, Lustyik sent text messages to Thaler regarding their expected profits, writing "We will be rich by halloween," and "I mean like RICH." *Indictment* at § 47.

- On September 8, 2012, Lustyik sent a series of text messages to Thaler regarding the seizure of Taylor's electronics at the border, telling Thaler: "Great. Now I go to jail too," and further explaining, "I'm so fcuked [sic]. I told him not to travel w electronics." *Indictment* at § 85.

- On September 9, 2012, Lustyik instructed Thaler, "[y]ou might have to save me and testify that only you r doing business w him." *Indictment* at § 99.

These communications are just a small sample from the Indictment, and a small fraction

of similar emails and text messages between and among the defendants that the Government has

uncovered during the course of its investigation.  The evidence against Lustyik is not only strong, it is overwhelming.

With respect to the third factor, the history and characteristics of the person, one of the factors the Court must consider is "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial . . ."  18 U.S.C. § 3142(g)(3)(B).  The Court now has new information regarding Lustyik's history and characteristics—within just a few weeks of being released on bond, he racked up five known violations of his conditions of release.  This, along with the information in the Government's initial motion, underscore the danger to the community that Lustyik presents—to say nothing of his disregard for the orders of this Court.

With respect to the fourth factor, the nature and seriousness of the danger to the community, here again Lustyik has provided the Court with information to remove any doubt about this factor:  he has himself contacted at least one potential witness on more than one occasion, made a payment of $26,000 in cash to that witness, and violated an additional condition of release in the process through his use of the telephone.

Separate and apart from the Court's consideration of the four factors under 18 U.S.C. § 3142(g)—which the Government submits weigh in favor of detention—the Government notes that the Court cannot release Lustyik on conditions of release unless it additionally concludes that he "will abide by such conditions."  18 U.S.C. § 3148(b).  The evidence outlined above demonstrates that Lustyik will not.  The violations discussed in this motion are not minor, technical violations, such as a missed appointment or calling in late to pretrial services.  These are significant and willful violations that erode the very purpose for establishing those conditions of release.  Two judges in two different districts, conducting de novo hearings on the

Government's motion to detain Lustyik, found that the high level of restriction they placed on Lustyik was necessary, and indeed, the reviewing judge felt that those restrictions did not go far enough, and added several others.  Now that Lustyik has shown he will flout even the most stringent restrictions this Court can impose, and do so in a way calculated to conceal the violations from authorities, there is only one way to guarantee there are no future violations: detaining him without bond.

## 9.  CONCLUSION

WHEREFORE, for the reasons stated above, the United States moves this Court to revoke defendant Lustyik's conditions of release and detain him without bond pending trial, and to hold a hearing on this motion as soon as practicable.

Respectfully submitted,

DAVID B. BARLOW
United States Attorney

*/s/ Carlos A. Esqueda*
CARLOS A. ESQUEDA
Assistant United States Attorney

JACK SMITH, Chief
Public Integrity Section

*/s/  Kevin Driscoll*
KEVIN O. DRISCOLL, Trial Attorney
MARIA N. LERNER, Trial Attorney
Criminal Division, U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20530
Telephone: (202) 514-1412; Fax: (202) 514-3003

JAIKUMAR RAMASWAMY, Chief
Asset Forfeiture & Money Laundering Section

*/s/  Pamela Hicks*

PAMELA HICKS, Acting Deputy Chief
ANN MARIE BLAYLOCK BACON, Trial Attorney
Criminal Division, U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20530
Telephone: (202) 514-1263