IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                        )
                              )
UNITED STATES OF              )
AMERICA,                      )
                              )
          Plaintiff,          )
                              )
vs.                           )    Case No. 2:12-CR-00645
                              )
ROBERT G. LUSTYIK, JR.,       )
MICHAEL L. TAYLOR,            )
JOHANNES W. THALER,           )
                              )
          Defendants.         )
                              )
_____       )




BEFORE THE HONORABLE TENA CAMPBELL

March 8, 2013


Transcript of Status Conference






Laura W. Robinson, CSR, RPR, CP, FCRR
350 S. Main Street
144 U.S. Courthouse
Salt Lake City, Utah 84101-2180
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:        Maria N. Lerner
Attorney at Law
US Department of Justice
Public Integrity Section
Criminal Division
1400 New York Avenue NW
Washington, D.C. 20005

Ann Marie Blaylock Bacon
US Department of Justice
Asset Forfeiture & Money
Laundering Section
Criminal Division
1400 New York Avenue NW
Washington, DC 20005

For Robert G.        Raymond Mansolillo
Lustyik, Jr.:      Attorney at Law
Coloian Mansolillo LLC
101 Federal Street
Suite 1900
Boston, MA  02210

Daniel Calabro, Jr.
Attorney at Law
Law Office of Daniel Calbro Jr.
127 Dorrance St. Lower Level
Providence, RI 02903

For Michael L. Taylor:    Daniel Marino
Marino Law PLLC
910 17th Street NW
Suite 800
Washington, D.C. 20006

Rebecca H. Skordas
Skordas Caston & Hyde
Attorney at Law
341 S. Main Street
Suite 303
Salt Lake City, Utah 84111

**Appearances of Counsel:**

For Michael L. Taylor:     Tillman James Finley
                                Marino Law PLLC
                                Attorney at Law
                                910 17th Street NW
                                Suite 800
                                Washington, D.C. 20006

For Johannes W. Thaler:    Daniel Calabro, Jr.
                                Attorney at Law
                                Law Office of Daniel Calbro Jr.
                                127 Dorrance Street
                                Lower Level
                                Providence, RI 02903

1          **Salt Lake City, Utah, March 8, 2013**

2                          * * * * *

3          THE COURT:  Okay.  We're here in the status in the

4     United States versus Lustyik, Taylor and Thaler.  And this

5     is one of those hearings where there are more people on the

6     telephone than there are in the courtroom.  So I'm going to

7     identify those who are here in person first, and then check

8     to make sure that the people on the phone can hear me.

9          For the government we have Ms. Lerner, right?

10         MS. LERNER:  Yes, Your Honor.

11         THE COURT:  Okay.  Then we have Mr. Marino here for

12    Mr. Taylor.

13         MR. MARINO:  Yes, Your Honor.

14         THE COURT:  We have Mr. Finley.

15         MR. FINLEY:  Yes, ma'am.

16         THE COURT:  And we have Ms. Skordas.  And, of course,

17    we have Mr. Taylor.  So on the phone for the government we

18    have got Ms. Blaylock.  Can you hear me, ma'am?

19         MS. BLAYLOCK:  Yes, Your Honor.

20         THE COURT:  And Mr. Driscoll, can you hear me?

21         MS. BLAYLOCK:  Mr. Driscoll is not going to be

22    participating, Your Honor.

23         THE COURT:  Okay, nor is Ms. Hicks, right?

24         MS. BLAYLOCK:  Nor is Ms. Hicks.

25         THE COURT:  Okay.  Then we have got Mr. Mansolillo.

1       Are you there?

2              MR. MANSOLILLO:  I am, Your Honor.  I can hear you

3       loud and clear.

4              THE COURT:  Very good.  And for Mr. Thaler, we have

5       Mr. Calabro, right?

6              MR. CALABRO:  Yes, Your Honor, I'm here as well.

7              THE COURT:  Okay.  First thing is where are we?  We

8       have set a trial date tentatively, did we not, for was it

9       August or exactly when.

10             MS. LERNER:  Your Honor, I think you're thinking of

11      Taylor One.

12             THE COURT:  Taylor One.  We don't have a date for

13      Taylor Two.

14             MS. LERNER:  That is correct, Your Honor.  I can give

15      you an update of where we are on discovery.  We served

16      defense counsel with our fifth production this morning,

17      which means that all Rule 16 discovery is finished with the

18      exception of hard drives that we obtained from Mr. Taylor

19      and Mr. Thaler.

20             Unfortunately, because of the volume of the material

21      on those hard drives, and the existence of potentially

22      privileged information, it is taking a long time for us to

23      process them and we're not going to be able to simply turn

24      them over.  But that is the only outstanding piece of Rule

25      16 discovery that is left.

1          THE COURT:  When you say Rule 16 discovery, is that a

2     narrow interpretation or are you following the sort of the

3     open file policy from this district?

4          MS. LERNER:  Um, it is -- I am not certain exactly how

5     you define open file policy, Your Honor, but I --

6          THE COURT:  Everything, I guess.

7          MS. LERNER:  We have gone, I think, far, far beyond

8     what our Rule 16 obligations are.  We have turned over quite

9     a bit of Jencks material.  The reason I am making a

10    distinction is that we're still in the process of gathering

11    Jencks material and we will turn that over on a rolling

12    basis.  But as far as what is purely under Rule 16, aside

13    from the hard drives that I mentioned, everything else has

14    been disclosed.

15         THE COURT:  If you were a betting woman, Ms. Lerner,

16    when would you bet that you would have all discovery turned

17    over?

18         MS. LERNER:  Um, I was told that six weeks is probably

19    a good bet.

20         THE COURT:  Six weeks from today?

21         MS. LERNER:  Yes.

22         THE COURT:  Then that takes us into about the first of

23    May.  By your guess that is about where we are?

24         MS. LERNER:  Yes.

25         THE COURT:  Okay.  With that in mind, just a moment

1    please.  Ms. Rice, if you would come here for just a moment,

2    please.  Okay.  Thank you.

3         So what is up from the point of view of the Defendant,

4    please?

5         MR. MANSOLILLO:  Your Honor, this is Ray Mansolillo,

6    if I may chime in.

7         THE COURT:  Sure.

8         MR. MANSOLILLO:  Just we can't hear very well

9    Ms. Lerner.  We heard bits and pieces of it, and I was just

10   wondering if whoever talks in the courtroom could maybe

11   either step up a little closer to the microphone.

12        THE COURT:  Yes.  You know what I'm going to ask, I'm

13   going to ask that when you speak that you speak into the

14   microphone.  But let me just summarize.  According to

15   Ms. Lerner, they believe that in about six weeks the

16   discovery will all have been turned over.  Is that a fair

17   recap of what you said?

18        MS. LERNER:  Yes, Your Honor.

19        THE COURT:  Okay.  All right.  Does that clarify

20   things, Mr. Mansolillo?

21        MR. MANSOLILLO:  Yes it does, Your Honor.  Thank you.

22        MS. LERNER:  Your Honor, may I clarify, that is for

23   unclassified material.

24        THE COURT:  Unclassified material, okay.  Why don't

25   you come up then just a moment please, why don't you come up

1   to the mike and tell me where we are in unclassified

2   material.  Now, I know that my staff and people who will be

3   dealing with this case are undergoing background checks.  Do

4   the defense counsel have to have the same thing?  Do you

5   have to do that, too?

6        MR. MANSOLILLO:  Your Honor, we're in the process of

7   doing that right now, Judge.  We have been in the process

8   for some time.

9        THE COURT:  Okay.  So that slows things way, way down.

10       MR. MARINO:  Your Honor, if I could, if I could just

11  mention, because I have discussed this with Ms. Lerner, and

12  I understand that Mr. Driscoll is actually the subject

13  matter expert for the government on that part of the case in

14  terms of discovery, but we have -- we're in the process of

15  applying for security clearances.  We understand that the

16  government has asked that we get top secret SCI clearances.

17  There is apparently some uncertainty about whether there is

18  actually going to be material classified at that level, but

19  we're nevertheless being told to get top secret SCI

20  clearances.  That process can't take any less than two

21  months.

22       THE COURT:  Yeah, it is -- which let me just stop you,

23  Ms. Lerner, why don't you come up here.

24       MS. LERNER:  Yes, Your Honor.

25       THE COURT:  When I think about what these allegations

1      are, is there really a necessity for all of this top secret

2      stuff?  I mean all of this -- we're not -- or is this just

3      unnecessary delay and expense and time.

4          MS. LERNER:  Your Honor, and I apologize, Mr. Driscoll

5      is having car troubles, he has been in contact with the

6      court security officer on this issue, my understanding is

7      that they wanted to try to get top secret clearance in the

8      event that it would be needed with the intent that it could

9      be scaled back if it is not.  I do hear --

10         THE COURT:  Why?  Who is directing that?  I mean I

11     think we're going in frankly with overkill.  I mean we're

12     wasting so much money and so much time.  I mean we have got

13     a man in custody.

14         Is there a way to let whoever is making these

15     decisions know that this more likely than not is not going

16     to be needed and what is against it that is going to be

17     needed.

18         MS. LERNER:  Your Honor, we agree that we should try

19     to move this as efficiently as possible and we will speak

20     with the CSO on trying to expedite the process and if it is

21     not necessary to get TS clearance, we will discuss that with

22     them.

23         THE COURT:  Why don't you make that a top priority.

24     We have had people flying out here.  My staff has taken days

25     to fill out forms.  They have had to hunt down all these

1    documents.  I am sure all of these people are too.  It is a

2    huge deal and it does not seem, unless I'm missing something

3    in this case, it does not seem necessary.  So if you would

4    please tell Mr. Driscoll is there any way to ensure that

5    that is not necessary.  Yes, sir, who is speaking?

6        MR. MANSOLILLO:  Your Honor, I'm sorry to interrupt

7    I -- I just would like as far as defense goes, and I think

8    we have discussed this in a somewhat not thoroughly with

9    Mr. Driscoll but our standpoint is it is absolutely needed

10    for our defense.

11        THE COURT:  You need it for your defense?

12        MR. MANSOLILLO:  Absolutely.  I discussed it with

13    Mr. Marino, I discussed it with Mr. Calabro, and from the

14    onset because of primarily Mr. Lustyik's job and what

15    Mr. Taylor was doing with Mr. Lustyik.  It is imperative

16    that we get the -- that we go through it.  I agree with you

17    it is an arduous process.  I'm very concerned about

18    Mr. Taylor being held at this time so I understand that, but

19    we couldn't put on a defense without it.

20        THE COURT:  Well, then I think that answers it.  But

21    the reason then is in your defense and that is undoubtedly

22    why it does not appear from the face of the pleadings.  But

23    I still will direct the government and everyone to let's

24    expedite this so we're not swallowed up and can't get down

25    to trying this case, all right?

1          MS. LERNER:  Yes, Your Honor.

2          MR. MANSOLILLO:  Thank you, Your Honor.

3          MR. MARINO:  If I could along those --

4          THE COURT:  Just a moment, please.  Yes, Mr. Burnett?

5          MARSHAL BURNETT:  Your Honor, just so the court is

6      aware, once everyone's -- once everybody has their

7      backgrounds completed, I think there may be an additional

8      delay once the jury has been selected also.

9          THE COURT:  Do they have to undergo background checks?

10          MARSHAL BURNETT:  I spoke with an individual at the

11      Justice Department and he said they don't have to go through

12      the same background, but it wasn't completely clear to me

13      what had to be done.  Because I brought to the attention an

14      individual that is connected with our backgrounds that if

15      everyone is getting a TS SCI clearance, then you have, you

16      know, a whole jury with no clearance at all.  I mean it kind

17      of makes moot for everyone in the courtroom to have a

18      clearance.  And so there was -- the response I got wasn't

19      completely clear.  But my impression was that I think

20      something would have to be done or at least look into the

21      jury's background.

22          THE COURT:  Okay.  Come on up, Ms. Lerner.  There are

23      real espionage cases, et cetera, that are tried.  How is

24      that handled?  Because I don't think that the jury members

25      should be asked nor would they go through what we have gone

1    through.

2         MS. LERNER:  I don't believe that that is the case,

3    Your Honor.  I believe if there is classified material that

4    needs to be used at trial, we would either try to get it

5    declassified or try to provide a substitute for that

6    material.  I think that is the whole point of CIPA is to

7    avoid having to disclose classified material to the jury or

8    anyone else.  I don't think we're going to have to go

9    through that process, but I should double check with

10   Mr. Driscoll.

11        THE COURT:  Why don't you do this.  For the next time

12   you make sure that Mr. Driscoll is here.

13        MS. LERNER:  I will do that, Your Honor.

14        THE COURT:  Because one of our impediments --

15        MR. MANSOLILLO:  Your Honor, we can't hear what is

16   going on again.

17        THE COURT:  What is happening is we're talking about

18   here we all have these backgrounds and then you just give

19   this information to 12 jurors.  And Deputy Marshal Burnett

20   said that there would be a modified background, his

21   understanding, I think that is probably so, but Ms. Lerner

22   said that their goal would be and her understanding is that

23   they will try not to disclose the actual stuff to the jury.

24        I directed Ms. Lerner to make sure that Mr. Driscoll

25   appears here next time at the next status.  He obviously

1      is the most knowledgeable in the area of the background

2      stuff to handle that.  I mean no jury in the world is going

3      to do even I think they would just rebel and rightly so.  So

4      if you'll get all -- when we have our next conference, make

5      sure that Mr. Driscoll is ready to go on all of the

6      questions about how do we handle all of this.

7              MS. LERNER:  I will, Your Honor.

8              THE COURT:  Thank you.  Okay.  Go ahead now, please.

9              MR. MARINO:  Could I just make a couple of points,

10     Your Honor?

11             THE COURT:  Of course you may.

12             MR. MARINO:  First of all, Your Honor, I don't think

13     anybody is going to go do a background check on the

14     potential jurors.  I mean that is just not --

15             THE COURT:  It doesn't make sense.

16             MR. MARINO:  That is not the way it is going to work.

17     And what is going to happen is first of all we need to find

18     out whether there really is classified information that

19     needs to be used and I don't know at this point whether or

20     not the discovery the government is talking about has

21     actually been classified or what level it has been

22     classified, whether agencies are reviewing the materials

23     now.  And so once we determine that, and I agree with

24     Mr. Mansolillo, there is very sensitive information in this

25     case that will be critical to the defense.  Much more

1      sensitive frankly than anything I have dealt with before

2      that has been classified as top secret SCI.

3            THE COURT:  Then that answers your question.

4            MR. MARINO:  So I don't think -- there is no doubt

5      that clearances are needed.  And just the information that

6      the defendant possesses, the defendant has possessed.  But

7      what is going to happen, I think, is that once we get a

8      date, supply CIPA notice to the government of the classified

9      information that we need to disclose, then it will have to

10     be disclosed to the jury and the public.  And then the

11     government will decide whether or not they can agree to

12     that, whether they agree that it is relevant and must be

13     disclosed.  The court will have to make some judgments about

14     it and probably have to have a hearing on the issue and then

15     decide whether stipulations could suffice, et cetera.  And

16     if ultimately the court determines that evidence like that

17     that the defense wants to use must be used in the -- in the

18     trial, it will be used publicly with the jury, they won't

19     get a background check, and then the attorney general will

20     have to decide whether or not the prosecution should go

21     forward with that information being disclosed.

22           And that is, in my experience, a very protracted

23     process which starts, in my view, with the CIPA notice from

24     the defense.  So the only reason I lay all that out, Your

25     Honor, is because it seems to me that that is going to be a

1    critical path issue for setting a date and setting a

2    schedule in this case.  So one thing that would be helpful

3    and I understand Ms. Lerner may not know, but it would

4    helpful to know today what is the status with this

5    information that is potentially classified.  Is it being

6    reviewed?  Has it already been classified and is on a shelf

7    so that as soon as we have clearances it can be disclosed to

8    us.  And I don't know if Ms. Lerner knows that, and I don't

9    want to put her in that position, but if she does, it might

10   be helpful to know.

11        THE COURT:  Okay.  What I'm going to direct you to do,

12   and those are very good points, Mr. Marino, I am going to

13   direct that you send to me, I am the only one now who

14   doesn't need the background clearance for whatever reason,

15   you have your team send me, and I will disclose that, I'll

16   try and disclose everything to all of you, send it off,

17   exactly what we're talking about here.  What do you have?

18   Where is it?  How do you think this must proceed?  Because

19   what we have really had is just this sort of floating in the

20   air is the kind of not exactly threat, but the idea of

21   classified materials.  Well now it is getting really down to

22   where we are.  I also would like you to give me in this

23   document which I will then share and it cannot be an

24   advocacy document, no, no, no.  And if you believe that

25   nothing classified is being revealed, then send it to all of

1    us, okay?

2         MS. LERNER:  Yes, Your Honor.  When you say it will be

3    shared, do you mean with the defense attorneys?

4         THE COURT:  Yes, shared with the defense attorneys.

5         MS. LERNER:  Sure.

6         MR. MANSOLILLO:  This is for the defense attorneys,

7    myself, Mr. Marino, and Mr. Calabro; is that correct?

8         THE COURT:  Yes.

9         MR. MANSOLILLO:  Would you be adverse, Your Honor, for

10   us to come and meet with you as well?  It is very

11   complicated, it is very detailed, it is very sensitive.  I

12   mean putting some of the information that we know that we

13   already know is classified in documents might -- I don't,

14   you know, in reality I think it will be fine, however I -- I

15   know we're not supposed to do that.

16        THE COURT:  Okay.  When you say come meet with me, do

17   you mean without the presence of the government attorney?

18        MR. MANSOLILLO:  That is correct.  Just the defense

19   and we'll go over what we -- what we're basically saying why

20   we need the -- and what it entails and the details it

21   entails.

22        THE COURT:  What do you think about that, Ms. Lerner?

23   Problems with that?

24        MS. LERNER:  Your Honor, I do have concerns because I

25   don't understand precisely what is being requested and I

1      think it may be premature.  I can give you an update on

2      where we are in the CIPA process.

3            THE COURT:  Yes.  But wait, let me just say, Mr.

4      Mansolillo --

5            MR. MANSOLILLO:  Yes.

6            THE COURT:  -- are you saying you all have documents

7      in your possession that are not documents that the

8      government has?

9            MR. MANSOLILLO:  I am not saying that, not documents,

10     but we do have information and there has been some e-mails

11     that we are and we're not through on all of them, but there

12     have been some e-mails that have been sent through a normal

13     discovery that have been passed through the classified

14     information system.  And we got those from the government.

15     I am not -- the ex-parte matter that I would like to discuss

16     to give the court some background, Mr. Marino was right on

17     about that.

18           I have had some experience with these cases before,

19     and the prosecution will eventually get the information that

20     we're going to be requesting.  So temporarily it will be

21     ex-parte, and then they are going to get the information

22     because some of it will be requested in discovery if they

23     don't provide it.

24           THE COURT:  So you're saying not that you have

25     documents, but that there are documents and that there is

```
 1        information that you're going to have to present and the way
 2        that you get that is through the government.  Am I
 3        understanding you?
 4             MR. MANSOLILLO:  That is exactly correct, Your Honor.
 5             THE COURT:  So ultimately the government is going to
 6        have to see that, right?
 7             MR. MANSOLILLO:  Yes, eventually they will have to see
 8        it, yes, you're correct.
 9             THE COURT:  So you want this to be ex-parte because it
10        reveals in part your defense, am I correct?
11             MR. MANSOLILLO:  That is correct.
12             THE COURT:  Okay.  All right.  With that
13        clarification, Ms. Lerner, it seems reasonable.
14             MS. LERNER:  I think it is premature, Your Honor,
15        because none of the parties at this point have seen what is
16        going to be produced classified, declassified, et cetera, in
17        the CIPA process.
18             THE COURT:  When will I know that?
19             MS. LERNER:  Well, if I -- I was about to say, Your
20        Honor, we have received all information from all of the
21        agencies that is potentially involved in this case and we
22        are in the process of reviewing it.  And I think what Your
23        Honor has asked from us is a preview of what our Section 2
24        notice is going to be and we hope to file that soon.
25             THE COURT:  Now you're speaking sort of in language
```

1    which is going over my head.  What is Section 2 notice?

2         MS. LERNER:  Section 2 sets forth the proposed

3    schedule for dealing with pretrial proceedings related to

4    CIPA.  So it would be reviewing the material that we

5    consider relevant.  The court would have to make a judgment

6    as to whether certain material is relevant to the defense

7    and we would require the government to turn it over.  It

8    would include CIPA notice that Mr. Marino has been referring

9    to.  It is the procedure for dealing with the CIPA material.

10        THE COURT:  And you think that until that is done, and

11   by that being done what would need to be done in your view

12   before the ex-parte meeting took place?  You say, in other

13   words, it is premature to have this meeting with the defense

14   and me.  Premature, so what would make it mature?

15        MS. LERNER:  Well, I think that there may not -- it

16   may not be necessary once the determination has been made as

17   to what material must be declassified, what material must be

18   produced to the defense.  It may answer whatever questions

19   Mr. Mansolillo may have.

20        THE COURT:  And okay.  So --

21        MR. MANSOLILLO:  May I address that?

22        THE COURT:  Sure.

23        MR. MANSOLILLO:  We believe that the defense is quite

24   opposite of what Ms. Lerner is saying.  And we can't let the

25   government, you know, tell us how to run our case and see

1    what is relevant.  I think that this meeting now would only

2    clarify to you, the court, who is going have to oversee this

3    and take hold of this monster, what is coming down the pike.

4    They -- we have information that we believe that we know is

5    we're going to be asking for that they don't have.  They

6    don't -- they haven't talked to our clients.  They don't

7    know what was happening with our clients and I think it is

8    quite the opposite.  I think it is only going to be helpful

9    to the case to move it along and to give the court and

10   yourself and everybody that is not involved in CIPA an

11   injection to these are guidelines.  Eventually the court is

12   going to be making the decision as to what gets turned over

13   or not.  Section 2 or any section of CIPA doesn't determine

14   that.  Either the attorney general says we don't turn it

15   over and you say well then the case can't go forward or vice

16   versa.  And so the court ultimately determines what has to

17   be turned over and not CIPA.  And it is just a procedural to

18   follow through.  And filing CIPA now is not -- is not going

19   to do anything to speed this up or change it.  It is just a

20   procedure that we have to file and statutory.  So I think

21   quite the contrary from what the government is presenting we

22   have a lot of information to discuss with you.

23        THE COURT:  Okay.  So Ms. Lerner, when you go through

24   your process of classifying, declassifying, et cetera, what

25   will the result be?  Some of the stuff is declassified,

1      right?

2          MS. LERNER:  That is our hope.

3          THE COURT:  And that is turned over.

4          MS. LERNER:  Yes.

5          THE COURT:  Some of the stuff remains classified,

6      right?

7          MS. LERNER:  Probably, yes.

8          THE COURT:  Does that get turned over to those who

9      have had their background investigations successfully

10     completed?

11         MS. LERNER:  I can't answer that in the abstract.

12     Some of the stuff may remain classified because it may be

13     irrelevant and will therefore not be shared with defense

14     counsel.

15         THE COURT:  Who makes that decision?  Surely not the

16     government.

17         MS. LERNER:  I think we make the initial determination

18     but Your Honor makes the final decision on that.

19         THE COURT:  Well, how do I know what you have

20     determined is not relevant?  Do I see all of the stuff even

21     that which you have deemed not relevant?

22         MS. LERNER:  We have been putting material in several

23     categories.  Stuff that we consider relevant but potentially

24     useful to the defense, relevant that we want to use, or

25     completely unrelated to this case.  It is only that last

1    determination that we're making the initial cut from.

2         THE COURT:  Okay.  So you will be turning over -- now,

3    when you turn stuff over, does -- is that turning over

4    without regard to whether it is relevant, whether it is

5    classified or not?  In other words, if you could see that it

6    was relevant to the defense but it would remain classified,

7    would you turn it over to the defense if they had

8    successfully completed their background?

9         MS. LERNER:  The CIPA procedures would govern that,

10   but I think that there are two pieces to that.  The first

11   piece being whether or not the defense is able to view it,

12   and the second piece being whether they're able to use it at

13   trial.  So I believe they would probably be able to view it,

14   but not -- but then we would have a separate litigation on

15   as to whether or not they would be able to use it at trial.

16        THE COURT:  Okay.  So they would get to view

17   everything that you see as relevant and that you see as

18   relevant to them classified or not if they have undergone

19   class -- a security clearance.

20        MS. LERNER:  I think once the CIPA procedures are

21   taken into account, that is what would happen.

22        THE COURT:  And then the stuff that isn't turned over

23   is what you have deemed not to be relevant.

24        MS. LERNER:  Correct.

25        THE COURT:  All right.  I understand that.  Yes,

1        Mr. Marino?

2           MR. MARINO:  Well, Your Honor, again I don't want to

3        mix up -- it seems to me one issue is what do we get in

4        discovery which, you know, I'm not really sort of contesting

5        right now.  The main event on the CIPA issue is what do I

6        get to mark as an exhibit and show the jury with the

7        newspaper reporter sitting in the courtroom.  That is the

8        main issue.  And that issue really takes time and effort.

9        First for me to give the notice, right, I have to see the

10       discovery that we get, I have to make a judgment about the

11       case about what exhibits we want to use in the trial.  So

12       that means I have got to go through all of the discovery, go

13       through the analysis, and then I have got to provide the

14       government with a CIPA notice, that is what the statute

15       requires, which tells them, it is normally a very thick

16       document, exactly what documents I intend to disclose at

17       trial, exactly what information, you know, the location of

18       an air field in Costa Rica or something, you know, what the

19       information is that I intend to disclose.  And that is

20       probably going to be more massive than any documents that we

21       get.

22           And so then the government is going to say well, you

23       don't need to disclose all of that, that is not really part

24       of your defense.  And we are going to say yes we do.  The

25       court is going to have to make a judgment about that and the

1    court is going to have to make a judgment about whether we

2    get to disclose that or whether a stipulation might suffice

3    of some kind, or redactions would be appropriate.  And

4    typically, at least in my experience, the court says no, the

5    jury has got to see the context of everything.  And then the

6    government is going to go back to the attorney general and

7    say here is what the judge said, now what do you want to do?

8    And they said we drop it or we move forward, and we drop

9    counts or whatever we do.  That whole process takes some

10   time.

11        Now I even talked to Mr. Mansolillo about this

12   proposed meeting, and it is interesting I haven't done that

13   before, I am not sure the statute contemplates it

14   necessarily, but it may not be a bad idea.  There may be a

15   point where we are providing, you know, that notice so that

16   we can explain it to the court in more detail.

17        THE COURT:  And I see what you're saying but I think

18   what we're now concerned about is when, as I understand it,

19   there might be documents that the government doesn't know

20   about that they have not requested, that they are not in the

21   process of classifying about whether it is totally not

22   relevant, whether it might be relevant to them, might be

23   relevant to you, that it might be beyond their knowledge.

24        MR. MANSOLILLO:  That is correct.

25        THE COURT:  But isn't it helpful for you first to see

```
1    what the government thinks is relevant to either one or the
2    other, and let's you see it.  I mean that is the first step.
3    I mean and I agree with you, so you see it, big deal, I mean
4    big deal but the thing is what is the jury going to get to
5    see, before we have the meeting, so then you can say these
6    documents have a whole in them they don't address our
7    defense of XYZ.
8         MR. MARINO:  I think that makes sense, Your Honor.
9         MR. MANSOLILLO:  That is fine, Your Honor.
10        THE COURT:  Okay.  So here is what I'm going to do and
11   I thank you for all of this.  We're going to set up a
12   status, and I can see setting a trial, you know, you might
13   be out here for ski season and I don't know when that might
14   be, but our first hurdle to get over is to deal with this
15   issue of classified material, CIPA, et cetera.  That is what
16   we are looking at first.  That is what you have to be geared
17   for.  So, we're going to set this down for six weeks and I
18   want to be sure that Mr. Driscoll is here.
19        MS. LERNER:  Of course, Your Honor.
20        THE COURT:  I want you to write me, and I don't think
21   that there is a problem really with having it being a sealed
22   pleading that goes to us all that is sealed, about exactly
23   what you're doing and what you contemplate doing and what
24   you have done so far.  Okay?
25        MS. LERNER:  All right, Your Honor.
```

1          THE COURT:  And let's have that in about three weeks.

2     And what you contemplate being done next.  Then we can all

3     work from that at our meeting in six weeks so we see where

4     the problems are and we can decide what to do after that.

5     Okay?  Does that seem like a working -- a way to work,

6     Ms. Lerner?

7          MS. LERNER:  Yes, Your Honor.

8          THE COURT:  Okay.  Mr. Mansolillo, Mr. Calabro, does

9     that work for you, your view of how this should proceed?

10          MR. CALABRO:  Yes, judge.  Just for clarification,

11     Your Honor, though you said a sealed pleading stating what

12     we are doing and what we're contemplating doing.  What

13     exactly are you asking us for, judge?  I guess I am not

14     sure.

15          THE COURT:  Who is this any way?

16          MR. CALABRO:  I'm sorry, Judge, this is Dan Calabro,

17     judge.

18          THE COURT:  Okay.  This comes from the government.

19          MR. CALABRO:  Okay.

20          THE COURT:  The government has got to tell us what

21     they're doing with this stuff they have, what they have got,

22     and not in great detail, of course, but we have requested

23     all of this.  This is what we are doing, this is how we

24     anticipate -- this is why we think it fits our obligation,

25     this is what we anticipate doing.  Then we work from that at

1    our meeting and we decide whether that is adequate, okay?

2         MR. CALABRO:  Fine.

3         THE COURT:  Okay.  How about you who are here?  Mr.

4    Marino, Ms. Skordas, Mr. Finley, what are you thinking?

5         MR. MARINO:  That sounds fine at this point, Your

6    Honor.

7         THE COURT:  Okay.  Now, I understand, and as you can

8    see we're getting into even more material, Mr. Marino, that

9    there might have been a glitch in your visiting with

10   Mr. Taylor there at Davis County.  However, I have had a

11   lengthy conversation with Marshal Burnett, and he has gone

12   to some great lengths, and I'm very appreciative with Davis

13   County, that you can have four-hour blocks of time with

14   Mr. Taylor if you give him notice that you're coming to town

15   and then he greases the wheels there at Davis County.

16        Did I -- am I correct on that, Marshal Burnett?

17        MARSHAL BURNETT:  Yes, Your Honor.

18        THE COURT:  Does that work for you?

19        MR. MARINO:  Yeah, Your Honor.  And Mr. Burnett did

20   agree to do that when we were here.  We have been working

21   with him and we appreciate it.  I came out the other day and

22   what I'm really doing is if I think I really need four hours

23   then I'll let him know.  And the other day I came out and

24   did not need that much time.  And the other thing is I'll

25   come on Saturday and Sunday and it is typically not a

1    problem to stay as long as we need to.

2         The issues that we are have is providing discs to

3    Mr. Taylor and having him review documents that way.  I

4    think Mr. Lund said at the detention hearing that he would

5    be able to do that and that just really hasn't been the case

6    but I think Mr. Burnett is trying to make arrangements so

7    that we can do that.  So we'll see.

8         THE COURT:  Marshal Burnett, what about that?  You

9    have been awfully good at this.  What can you do to solve

10   that problem?

11        MARSHAL BURNETT:  It is my understanding that the

12   inmates at Davis County Jail have access to the computers

13   but the internet access is somewhat limited for obvious

14   reasons.  I think I can even drive up this afternoon and

15   speak with the shift commander and see if any arrangements

16   can be made in regards to that disk.

17        THE COURT:  Okay.

18        MR. MARINO:  I have talked to many people there, Your

19   Honor, and in fact I think when we met with the marshal

20   service the last time I was here I thought they had

21   indicated there was really no facility that would permit

22   that to view disks.  If it can be done, it can be done, just

23   no one at the jail seems to think that is in the course.

24        THE COURT:  Let me tell you something.  When Marshal

25   Burnett turns his mind to it, it is probably going to get

1        done.

2            MR. MARINO:  I believe that.  I have no reason to

3        doubt that.

4            THE COURT:  I think that is wise.

5            MR. MARINO:  And so we're trying to work with it.  It

6        is difficult, you know, because -- and it sounds funny but

7        I'm sure Your Honor has been in this position trying to work

8        with witnesses in the past and so forth as a practicing

9        attorney, but, you know, you go to jail I can't -- sometimes

10       I can't get a contact visit, I have to be on a phone, I have

11       got the phone up on my shoulder, I'm trying to work on the

12       computer, and then I'm trying to talk to Mr. Taylor over the

13       phone for 14 minute blocks about documents that he can't be

14       in front of the computer while he is talking to me on the

15       phone.  I mean those are practical day-to-day things that I

16       just have never had to deal with in a white collar case

17       before.  But we're doing what we can.

18           THE COURT:  Okay.  Thank you, um, Marshal, when the

19       visits -- let's say Mr. Marino has given notice and you have

20       got a four hour block of time and that there have been

21       arrangements made so that Mr. Taylor has access to disks and

22       stuff, are they contact visits generally?

23           MARSHAL BURNETT:  I haven't been to Davis County in

24       their visiting room so I can't say definitively.  And I

25       think Mr. Marino may have more knowledge on whether it is

```
1     contact or not.
2          MR. MARINO:  They're usually contact visits, Your
3     Honor.  That hasn't generally been a problem.
4          THE COURT:  Davis is the best.  I think --
5          MR. MARINO:  It is difficult.
6          THE COURT:  I think what you're going to find is that
7     when Marshal Burnett gets through with them, with proper
8     notice you will have contact four-hour visits and Mr. Taylor
9     will have had the benefit of looking at the disks.  Okay?
10         MR. MARINO:  All right.  Well, good.
11         THE COURT:  Okay.
12         MR. MARINO:  Thank you, Your Honor.
13         THE COURT:  Thank you.  And thank you Marshal.
14    Anything else we need to do?
15         MS. LERNER:  Set our next status, Your Honor.
16         THE COURT:  Yes.  Does six weeks -- is that too long
17    or is that long enough?  Does that allow you, Ms. Lerner, to
18    be prepared to tell us in writing what is happening?
19         MS. LERNER:  We should be able to do that, Your Honor.
20         THE COURT:  Okay.  And then what I would ask is --
21    thank you.  Did I ask you last time, Ms. Lerner, to prepare
22    a speedy trial act -- speedy trial order.  Was that you?
23         MS. LERNER:  Yes, and I did, Your Honor.
24         THE COURT:  You did.  And you did it so well that I am
25    going to ask you to do it again.
```

1          MS. LERNER:  All right.

2          THE COURT:  Does that work?

3          MS. LERNER:  Yes Your Honor, of course.

4          THE COURT:  All right.  Anything else that I can do

5     for you all?

6          MR. MARINO:  Not from the Defendant Taylor.

7          THE COURT:  Okay.

8          MR. MANSOLILLO:  What is the date, Your Honor?

9          THE COURT:  All right.  And anybody on the phone,

10    anything I can do?

11         MR. CALABRO:  We're all set, this is Dan Calabro.

12         THE CLERK:  All right.

13         THE COURT:  When is our next day.

14         THE CLERK:  The week of April the 15th you are only

15    here three days that week.

16         THE COURT:  Let's make it that week.

17         THE CLERK:  If counsel wanted to come on a Monday, if

18    that is more convenient for them, we could do it on the 15th

19    of April.

20         THE COURT:  Do we have a Taylor -- yes, ma'am.

21         MS. LERNER:  I was hoping we could do it towards the

22    end of April, I think that is closer to six weeks.  Is that

23    -- or am I counting too far out?

24         THE COURT:  The problem might be me.  When do we have

25    the status in the Young case?

1              MR. MARINO:  April 5th.

2              THE COURT:  April 5th.  That is too soon, right?

3              THE CLERK:  You're back in Tennessee on the 6th of

4    May.  3rd of May.

5              THE COURT:  May 3rd?  Does that work for the

6    government?

7              MS. LERNER:  Yes, Your Honor.

8              THE COURT:  How about the defense?

9              MR. MANSOLILLO:  Yes, Your Honor.

10             MR. CALABRO:  Yes, Your Honor.

11             MR. MARINO:  I'm checking Your Honor.

12             MR. FINLEY:  That is fine.

13             THE COURT:  That is fine.  May 3rd.

14             THE CLERK:  10:00 a.m.

15             THE COURT:  Okay.  And our focus will be on discovery

16   and classified info.  And the issue is how are we

17   expeditiously and we believe efficiently going to handle it.

18   Okay?

19             MR. CALABRO:  Your Honor, Dan Calabro, again, I'm

20   sorry, Judge, if I may.  Are we allowed to call in again or

21   would you like us to be there?

22             THE COURT:  You can call.

23             MR. CALABRO:  Thank you, Your Honor.

24             THE COURT:  You may call.  Thank you very much.  We're

25   in recess.

1            (Whereupon, the hearing concluded at 10:42 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      STATE OF UTAH              )

 2                                 )ss

 3      COUNTY OF SALT LAKE        )

 4

 5              I, Laura W. Robinson, Certified Shorthand

 6      Reporter, Registered Professional Reporter and Notary Public

 7      within and for the County of Salt Lake, State of Utah, do

 8      hereby certify:

 9              That the foregoing proceedings were taken before

10      me at the time and place set forth herein and were taken

11      down by me in shorthand and thereafter transcribed into

12      typewriting under my direction and supervision;

13              That the foregoing pages contain a true and

14      correct transcription of my said shorthand notes so taken.

15              In witness whereof I have subscribed my name and

16      affixed my seal this 18th day of March, 2013.

17

18                              _____

19                              Laura W. Robinson

20                              CSR, RPR, CP, FCRR

21

22

23

24

25
```